UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

SHELDON H. SOLOW,

                         Plaintiff,          10 Civ. 2927(RWS)

    -against-                                OPINION

CITIGROUP, INC. and VIKRAM PANDIT,

                         Defendants.

-------------------------------------X

A P P E A R A N C E S:

          Attorneys for Plaintiff

          LOWENSTEIN SANDLER PC
          1251 Avenue of the Americas
          New York, NY  10020
          By:  Ira Lee Sorkin, Esq.
               Donald A. Corbett, Esq.
               Jeffrey J. Wild, Esq.


          Attorneys for Defendants

          HUGHES HUBBARD & REED LLP
          One Battery Park Plaza
          New York, NY  10004-1482
          By:  Marc A. Weinstein, Esq.
               Jesse L. Jensen, Esq.

Sweet, D.J.


Defendants Citigroup Inc. ("Citigroup") and Vikram
Pandit ("Pandit," and, with Citigroup, the "Defendants") have
moved pursuant to Federal Rules of Civil Procedure 12(b)(6) and
9(b) to dismiss the First Amended Complaint of plaintiff Sheldon
H. Solow ("Solow" or the "Plaintiff") alleging violation of the
securities law and common law fraud.  Based upon the conclusions
set forth below, the motion is granted and judgment will be
entered dismissing the complaint.


**Prior Proceedings**


On April 5, 2010, the Plaintiff[1] filed his initial
complaint, naming Citigroup as the sole defendant.  The action
was referred to the Honorable Sidney H. Stein as related to In
re Citigroup Inc. Sec. Litig., No. 07 Civ. 9901 (SHS).  Judge
Stein declined the action as unrelated, and it was assigned as
designated above.  On June 29, 2010, Citigroup filed motions

---

[1]    Sheldon H. Solow is a successful real estate developer,
known for both his iconic Manhattan tower, 9 West 57th Street,
as well as other development projects throughout the City of New
York.  He is also a frequent litigant in matters concerning his
real estate holdings.  See "Sheldon Solow," Forbes, Oct. 11,
2010; Charles V. Bagli, "Empire Built by Developer Shows Signs
of Distress," New York Times, Apr. 1, 2010.

both to stay all proceedings pending resolution of a motion to dismiss in the case pending before Judge Stein and to dismiss Plaintiff's complaint.  The parties stipulated to a briefing schedule concerning Citigroup's motion to stay, with Citigroup's motion to dismiss to be subsequently addressed.  While the motion to stay was pending, Judge Stein ruled on the pending motion to dismiss, thereby mooting Citigroup's request.

Following Judge Stein's decision in In re Citigroup Inc. Sec. Litig., No. 07 Civ. 9901, Solow and Citigroup agreed to provide Solow until January 7, 2011 to decide whether to proceed with his existing complaint or file an amended complaint.  The parties subsequently stipulated to extend the deadlines until late February.  On February 23, Plaintiff filed his First Amended Complaint (the "FAC").  In addition to Citigroup, the FAC named Citigroup's CEO, Pandit, as a defendant.

The FAC alleges three counts:  (1) a claim against both Defendants for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, alleging that the Defendants fraudulently caused the market price for Citigroup shares to

increase; (2) a claim under Section 20(a) of the Exchange Act against Pandit for control person liability; and (3) a claim against both Defendants for common law fraud.  These causes of action were based on the following allegations set forth in the FAC.

On September 15, 2008, Lehman Brothers filed for bankruptcy, prompting the Dow Jones Industrial Average and the price of Citigroup shares to drop precipitously.  On that same day, in an alleged effort to boost investor confidence, Citigroup CEO Pandit issued a memorandum to Citigroup employees, which was reprinted in The Wall Street Journal.  The memorandum allegedly urged employees to "remind our clients and shareholders" that Citigroup's "capital ratio" was "well in excess of the 'well-capitalized' regulatory minimums" and that Citigroup's "cash position is very strong."  FAC ¶ 14.  The memorandum also stated that "Citigroup continues to boast a strong deposit base that is diversified across products and regions."  Id.  The FAC alleges that these representations concerning Citigroup's financial position were false.  Id. ¶ 16.

In addition to describing the September 15 memorandum, the FAC details various other alleged misrepresentations

3

concerning Citigroup's purportedly strong capital and liquidity
position made throughout the fall of 2008, including:

- "Citi maintains an unmatched, globally dominant
  franchise with strong liquidity, total deposits
  exceeding $800 billion and a Tier 1 capital ratio
  of 8.7% as of the second quarter." Id. ¶ 24
  (Oct. 3, 2008).

- Citigroup "maintained its 'well-capitalized'
  position." "Our liquidity position also remained
  very strong during the third quarter of 2008 and
  will continue to be enhanced ..." "[T]he
  enhancement of our liquidity position [has]
  allowed us to continue to maintain sufficient
  liquidity to meet all debt obligations maturing
  within a one-year period without having to access
  unsecured capital markets." Id. ¶ 38 (Oct. 31,
  2008).

- Pandit stated that Citigroup's "capital is
  plentiful" and the bank has an "abundance of
  liquidity." Id. ¶ 40 (Nov. 14, 2008).

- Pandit reassured his employees that "the bank's
  capital base is strong." Id. ¶ 42 (Nov. 18,
  2008).

- "Citi has a very strong capital and liquidity
  position...." Id. ¶ 47 (Nov. 20, 2008).

The FAC also describes how, in late September 2008,
Citigroup announced a purported "rescue" of Wachovia (the
"Wachovia Transaction"), intending to give the appearance that
it was saving a weaker institution, but the rescue was never
consummated. Id. ¶ 22. It is alleged that Citigroup attempted
to use the Wachovia Transaction to convince its investors that

4

it was a strong and stable financial institution and made the following representations:

- "Citi agreed to the government's request to assist with a rescue of Wachovia....  This was a deal Citi wanted rather than one we needed.... Had an agreement between Citi and Wachovia not been reached on September 29, [2008] Wachovia would have failed the following day." FAC ¶ 21.

- "We saved Wachovia from collapsing."  Id.

- "We did not seek the Wachovia transaction. Wachovia brought it to us."  Id.

- "With or without this transaction, Citi maintains an unmatched, globally dominant franchise with strong liquidity, total deposits exceeding $800 billion and a Tier 1 capital ratio of 8.7% as of the second quarter."  Id. ¶ 24.

The FAC also quotes individuals involved in the Wachovia Transaction, alleging that, after Wachovia decided to be acquired by Wells Fargo, not Citigroup, FDIC Chairman Bair refused to renegotiate the Wachovia Transaction at Pandit's request, because the Wachovia Transaction would have been the "selling [of] a troubled institution ... with a troubled mortgage portfolio to another troubled institution."  FAC ¶ 26. Chairman Bair further stated that she believed that if the Wachovia Transaction had been consummated "Citigroup would have to have been bailed out again."  Id.  Edward Kelly ("Kelly"),

5

Citigroup's Vice Chairman, allegedly expressed this same
sentiment:  "Having agreed to do the deal was a recognition on
our part that we needed it ... [a]nd if we needed it and didn't
get it, what did that imply for the strength of the firm going
forward?"  Id. ¶ 27.

It is alleged that at the same time that Citigroup was
representing that it had capital and liquidity strength and
misrepresenting the nature of the Wachovia Transaction, it was
secretly borrowing hundreds of billions of dollars from the
Primary Dealer Credit Facility ("PDCF"), a lending facility
authorized by the Federal Reserve designed to help banks in
distress.  FAC ¶ 30-32.  The FAC states that, according to the
Federal Reserve, the PDCF was the "lender of last resort" that
served as a "back-up source of liquidity for institutions that
are unable to access short-term funding in the market, whether
for operational or other reasons."  Id. ¶ 30 (quoting
Declaration of Susan E. McLaughlin, Senior Vice President at the
Federal Reserve Bank of New York).  Citigroup is alleged to have
borrowed $126.5 billion in September of 2008 and $312.9 billion
in October of 2008 from the PDCF.  Id. ¶ 33.

6

The FAC states that, even after receiving $25 billion in TARP funds on October 14, 2008, Citigroup "was the subject of a global run on its deposits" and "the cost of insuring its debt in the credit default swap market was increasing at an alarming pace compared to its peers." Id. ¶ 36. On November 21, cash lock-ups were imposed upon Citigroup by the United Kingdom's Financial Services Authority, which an FDIC examiner concluded "could be very damaging to Citi's liquidity." Id. ¶ 49. There was a run on Citigroup's foreign deposits and counterparties had stopped providing Citigroup with funding. Id. ¶ 50.

The FAC alleges that, by mid-November 2008, Treasury Secretary Henry Paulson advised President Bush that Citigroup was "teetering on the brink of failure" and that "Citi has a very weak balance sheet." Id. ¶ 44. An FDIC Senior Deputy Director "characterize[d] the liquidity and confidence situation as negative and deteriorating such that viability may be threatened without outside support." Id. ¶ 49. Another FDIC official stated that Citigroup's "immediate risk" was liquidity. Id. Citigroup's own calculations suggested that a drop in deposits of just 7.2% would wipe out its cash surplus and if the trend of recent withdrawals continued, the company could expect a 2% outflow of deposits per day. Id. ¶ 54. Citigroup

7

determined that unless it received a large capital injection, its cash would be wiped out completely before the November 22-23 weekend. Id. As the TARP Inspector General would later conclude, "it became clear the risk profile of Citigroup was increasing rapidly, and liquidity pressures had reached crisis proportions." Id. ¶ 50.

According to the Plaintiff, on November 22, Citigroup secretly requested that the government provide a $306 billion guarantee for its troubled assets while requesting "capital forbearance" on all such assets. Id. ¶ 51. The FDIC was open to providing assistance to Citigroup because "[the FDIC was] on the verge of having to close this institution because it can't meet its liquidity[.]" Id. ¶ 53. Citigroup's collapse was prevented when the Government put together a massive rescue package during the crisis weekend of November 22-23, including a $20 billion capital injection and a $306 billion guarantee for Citigroup's illiquid and troubled assets. Id. ¶ 55. The FAC alleges that Citigroup continued to conceal its crisis from the market even on the eve of this bailout, which occurred hours after Citigroup's November 20 announcement of its "very strong capital and liquidity position." Id. ¶¶ 47-55.

8

It is further alleged that less than two months later, notwithstanding the government bailouts, The New York Times reported that Citigroup was considering selling off Smith Barney, its retail brokerage business, to Morgan Stanley, a move the Times characterized as highlighting Citigroup's "desperate need to raise capital." FAC ¶ 57. This reporting contradicted Citigroup's continued representations regarding its capital strength and well-capitalized position. Id. On January 15, 2009, Citigroup filed a Form 8-K, detailing the terms of the $326 billion bailout, and, on January 16, 2009, Citigroup announced at $8.29 billion loss for the fourth quarter of 2008 and further write-downs of $5.6 billion. FAC ¶¶ 60, 61.

It is alleged that based on Defendants' misrepresentations, Plaintiff reasonably believed that Citigroup, unlike other financial institutions, was strong notwithstanding the economic turmoil in late 2008 and early 2009. As a result of this mistaken belief, Plaintiff purchased and retained 10,000 shares of Citigroup common stock on September 30, 2008, at $21.02 per share, for an aggregate price of $210,239, and an additional 30,000 shares of Citigroup common stock on November 12, 2008, at $9.88 per share, for an aggregate price of $299,421. FAC ¶¶ 67-68.

9

Defendants Citigroup and Pandit filed their motion to dismiss the FAC on April 20, 2011.  The motion was marked fully submitted on June 29, 2011.

## The Applicable Standard

On a motion to dismiss pursuant to Rule 12, all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader.  Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).  The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 235-36, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Bell Atl Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

10

Plaintiffs must allege sufficient facts to "nudge[ ] their
claims across the line from conceivable to plausible." Twombly,
550 U.S. at 570.  Though the court must accept the factual
allegations of a complaint as true, it is "not bound to accept
as true a legal conclusion couched as a factual allegation."
Iqbal, 129 S.Ct. at 1950 (quoting Twombly, 550 U.S. at 555).

The FAC alleges three counts: (1) violations of
Section 10(b) of the Exchange Act and Rule 10b-5 promulgated
thereunder (against both Defendants); (2) violation of Section
20(a) of the Exchange Act (against Pandit); and (3) common law
fraud (against both Defendants).

**Defendants' Motion To Dismiss Count One Is Granted**

Count One of the FAC accuses both Defendants of
violating Section 10(b) of the Exchange Act and Rule 10b-5.  To
state a claim under Section 10(b) and Rule 10b-5, a plaintiff
must allege: (i) a misstatement or omission of material fact
(ii) with scienter (iii) in connection with the purchase or sale
of a security, (iv) upon which the plaintiff relied, and (v)
that the misstatement or omission proximately caused economic
loss.  See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42
(2005); Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153

11

(2d Cir. 2007).   Failure to plead properly any one element

necessitates dismissal of the claim.   See, e.g., Good Hill

Partners L.P. v. WN Asset Holdings Corp. CI, 583 F. Supp. 2d

517, 520-21 (S.D.N.Y. 2008).


## A. Some, But Not All, Of The FAC's Alleged Misstatements Or Omissions Are Sufficient To Support A Claim


        Rule 10b-5 makes it unlawful to "make any untrue

statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of

the circumstances under which they were made, not misleading."

17 C.F.R. § 240.10b-5.   "[The] materiality requirement is

satisfied when there is a substantial likelihood that the

disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the total

mix of information made available."   Matrixx Initiatives, Inc.

v. Siracusano, 131 S.Ct 1309, 1318 (2011) (internal citations

omitted).   "Because materiality is a mixed question of law and

fact, in the context of a Fed. R. Civ. P. 12(b)(6) motion, a

complaint may not properly be dismissed . . . on the ground that

the alleged misstatements or omissions are not material unless

they are so obviously unimportant to a reasonable investor that

reasonable minds could not differ on the question of their importance." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009)

Count One of the FAC is predicated on three categories of alleged misrepresentations: (1) Citigroup's misstatements and omissions concerning its liquidity; (2) Citigroup's misstatements and omissions concerning its capitalization; and (3) Citigroup's misstatements and omissions concerning the Wachovia Transaction.  While the FAC pleads sufficient facts alleging misstatements and omissions concerning Citigroup's liquidity, the FAC fails to plead misstatements and omissions concerning Citigroup's capital or the Wachovia Transaction.[2]

---

[2]   In addition to alleged misstatements and omissions made prior to November 12, 2008, the FAC also alleges that Citigroup made several misstatements from November 12, 2008 through March 2010.  FAC ¶¶ 39-56.  These statements are not actionable as they were made after the Plaintiff already had purchased his shares of Citigroup stock.  Alleged misstatements that do not occur in connection with the sale or purchase of securities are not actionable under the Exchange Act.  See 15 U.S.C. § 78j(b)(prohibiting fraud only "in connection" with purchase and sale of security); see also Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 737-38, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (prohibiting recovery where no sale or purchase of securities is alleged); First Equity Corp. v. Standard & Poor's Corp., 869 F.2d 175, 180 n.2 (2d Cir. 1989) (10b-5 plaintiffs "may recover only for losses that result from decisions to buy or sell, not from decisions to hold or refrain from trading"); Hunt v. Enzo Biochem, Inc., 471 F. Supp. 2d 390, 410 n.130 (S.D.N.Y. 2006) ("Holder claims are barred under federal securities law.").

## 1. **The Liquidity Allegations Are Adequately Pled**

The Plaintiff's allegation is that it was false and misleading for Citigroup to tout its "strong" liquidity while not disclosing borrowings from a facility that was a "back up source of liquidity for institutions that are unable to access short-term funding in the market, whether for operational or other reasons." FAC ¶¶ 29, 30. This Court has recognized that false and misleading statements about liquidity strength are actionable under Section 10(b). In re Bear Stearns Cos. Inc. Sec., Derivative & ERISA Litig., 763 F. Supp. 2d 423, 497 (S.D.N.Y. 2011). The FAC alleges that throughout the fall of 2008, Citigroup repeatedly represented that its liquidity was "strong." On September 15, 2008, Pandit stated that Citi's "cash position is very strong" and that "Citigroup has a large international and domestic base of deposits which should provide it with a 'low-cost source of funding.'" FAC ¶¶ 14, 15. In early October 2008, Citigroup issued a press release boasting that it "maintains an unmatched, globally dominant franchise with strong liquidity." Id. ¶ 24.

14

The FAC also alleges how, in its Form 10-Q for the third quarter of 2008, Citigroup stated that its "liquidity position also remained very strong during the third quarter of 2008" and that "the enhancement of our liquidity position [has] allowed us to continue to maintain sufficient liquidity to meet all debt obligations maturing within a one-year period without having to access unsecured capital markets." Id. ¶ 38. Citigroup's Form 10-Q also allegedly stated that it had increased its "structural liquidity (equity, long-term debt, and deposits), as a percentage of assets, from 55% at September 30, 2007 to approximately 64% at September 30, 2008." Id. ¶ 38.

The FAC draws a contrast between these statements on the part of Citigroup and its CEO and the fact that Citigroup borrowed some $126 billion in September 2008 and $312 billion in October 2008 from the PDCF, which the FAC describes as the "lender of last resort," which served as "a back-up source of liquidity for institutions that are unable to access short-term funding in the market, whether for operational or other reasons." FAC ¶ 30, 33. Citigroup argues that the Plaintiff has mischaracterized the funding by PDCF, Defs.' Reply at 3-4, and failed to recognize it an "overall market correction device," id. at 4. The cause and effect of this borrowing is a

15

factual issue, but the allegation that the liquidity
representations were false is adequately pled.  The FAC also
describes how, in November 2008, "liquidity pressures had
reached crisis proportions," how "there was a run on Citigroup's
foreign deposits," and how counterparties had stopped providing
Citigroup with funding.  FAC ¶ 50, 52.

By describing how Citigroup allegedly touted its
strong liquidity while not disclosing large borrowings from a
lending facility authorized by the Federal Reserve designed to
help banks in distress, the FAC pleads sufficient facts to
establish alleged material misstatements and omissions made by
the Defendants with respect to the issue of Citigroup's
liquidity.

## 2. **The Capital Allegations Are Inadequately Pled**

In addition to attacking Citigroup's statements
concerning its liquidity, the FAC alleges that Citigroup's
statements regarding its capital strength were false and
misleading.  In alleging misstatements and omissions prior to
November 12, 2008, the Plaintiff has relied principally on two
Citigroup statements: the memorandum of September 15, 2008 to

16

Citigroup employees that the Citigroup "capital ratio" was "well in excess of 'well capitalized' regulatory minimus," FAC ¶ 14, and Citigroup's third quarter statement 10-Q of October 31, 2008 stating that Citigroup "maintained its 'well-capitalized' position" and "increased its structural liquidity as a percentage of assets." FAC ¶ 38.

The Plaintiff argues that it has pled facts sufficient to establish Citigroup's misstatements and omissions concerning its level of capitalization. While Citigroup was describing itself as "well-capitalized," the FAC alleges that Citigroup engaged in "Repo 105" transactions in which it misclassified over $7 billion in "repurchase agreements" as sales. FAC ¶ 65. As described above, the FAC also alleges that Citigroup borrowed hundreds of billions of dollars from the PDCF. However, "well-capitalized" is a term of art, and banks are considered to be well-capitalized if, among other metrics, they have a Tier 1 risk-based capital ratio of 6.0 or greater. See 12 C.F.R. § 325.103. The Defendants argue that Citigroup's Tier 1 risk-based capital ratio exceeded this threshold throughout the time period covered by the FAC. Defs.' Memo. at 12. In response, the Plaintiff argues that the basis of Defendants' contention that Citigroup's Tier 1 capital was always in excess of

17

regulatory minimums is Citigroup's quarterly earnings
announcement, which says nothing about Citigroup's Tier 1
capital ratio during each quarter.  Pls.' Opp. at 13.  As such,
Citigroup's quarterly earnings announcements did not provide
Citigroup's capital ratios during October 2008 before Citigroup
received over $300 billion from the PDCF.  Such facts, however,
are not pled in the FAC and, even if they were, "[c]onclusory,
hypothetical speculation . . . is not entitled to an assumption
of truth on a motion to dismiss."  Tsereteli v. Residential
Asset Securitization Trust, 697 F. Supp. 2d 546, 548 n.9
(S.D.N.Y. 2010) (citing Twombly, 550 U.S. at 555).

Notwithstanding the FAC's allegations, the Plaintiff
has failed to present sufficient facts alleging Citigroup's
capital ratio to have fallen below the legally prescribed
threshold.  As such, the FAC fails to present the misstatements
or omissions necessary to support a Section 10(b) or Rule 10b-5
claim predicated on Citigroup's statements concerning its level
of capitalization.

### 3. The Wachovia Allegations Are Inadequately Pled

18

The Plaintiff has alleged that Citigroup made misstatements regarding Citigroup's deposit base and pretended that its bid to acquire Wachovia was designed to save Citigroup rather than to save Wachovia.  FAC ¶¶ 17-28; Pls.' Opp. at 15-16.  Specifically, the FAC describes how, on September 15, 2008, Pandit said that "Citigroup has a large international and domestic base of deposits which should provide it with a low cost of funding."  FAC ¶ 15.  Additionally, the FAC notes that, in an October 6, 2008 press release, Citigroup stated that "[t]his was always a deal Citi wanted rather than one we needed."  Id. ¶ 21.  The Plaintiff alleges that these statements were false considering that "[d]espite its earlier false statements regarding its strong base of domestic deposits, Citigroup's survival depended upon its acquisition of a domestic bank, such as Wachovia, which could provide Citigroup with the domestic-deposit base it claims to have, but sorely lacked." Id. ¶ 25.  The FAC alleges that Citigroup misstated its ability to save Wachovia and that "this was not a plan to rescue Wachovia" but "a well-concealed effort to save Citigroup."  Id. ¶ 25.

The Plaintiff fails to present sufficient facts establishing any misstatements or omissions.  The FAC relies on

19

statements from FDIC Chairwoman Sheila Bair and Citigroup Vice Chairman Ned Kelly, stating that "[h]aving agreed to do the deal was a recognition on [Citigroup's] part that [it] needed it" and that Citigroup was a "troubled institution" that "would have to have been bailed out again" if the deal been closed.  FAC ¶¶ 26, 27.  However, the fact that Ms. Bair later stated that she had concerns that the deal might threaten Citi does not contradict Citi's statements that its intended acquisition would save Wachovia.  With respect to Kelly's statement, according to the Defendants, Kelly simply expressed what he perceived to be the current view of the market.  The FAC's conclusory allegations that the Wachovia Transaction was, in reality, a transaction to save Citigroup are insufficient to establish an actionable misstatement or omission.  Accordingly, the Plaintiff's Section 10(b) and Rule 10b-5 claims arising out of allege misstatements or omissions relating to the Wachovia Transaction fail.


B. **Scienter Is Adequately Pled**


Under the Private Securities Litigation Reform Act ("PSLRA"), a plaintiff is required to state "with particularity" facts giving rise to "a strong inference" that the defendant acted with fraudulent intent.  15 U.S.C. § 78u-4(b)(2).  A

20

"strong inference" of scienter can be established through
allegations "(1) showing that the defendants had both motive and
opportunity to commit the fraud or (2) constituting strong
circumstantial evidence of conscious misbehavior or
recklessness." ATSI Commc'ns., Inc. v. Shaar Fund, Ltd., 493
F.3d 87, 99 (2d Cir. 2007). "[S]ecurities fraud claims
typically have sufficed to state a claim based on recklessness
when they have specifically alleged defendants' knowledge of
facts or access to information contradicting their public
statements. Under such circumstances, defendants knew or, more
importantly, should have known that they were misrepresenting
material facts related to the corporation." Novak v. Kasaks,
216 F.3d 300, 308 (2d Cir. 2000). "A complaint will survive . .
. only if a reasonable person would deem the inference of
scienter cogent and at least as compelling as any opposing
inference one could draw from the facts alleged." Tellabs, Inc.
v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324, 127 S.Ct.
2499, 168 L.Ed.2d 179 (2007). Here, the Plaintiff has contended
that scienter has been adequately pled based upon his
allegations regarding (i) Citigroup's borrowing from the PDCF in
September and October 2008, and (ii) events that occurred
subsequent to Plaintiff's purchase of Citigroup stock. Pls.'
Opp. at 17-21.

21

The allegations that Citigroup knew its capital and liquidity were deteriorating, while continuing to represent that its capital and liquidity were "strong" and "plentiful" give rise to a strong inference of scienter.  See In re AIG, Inc. 2008 Sec. Litig., 741 F. Supp. 2d 511, 533 (S.D.N.Y. 2010) (defendants' positive statements regarding asset values and risk management despite "internal indicators to the contrary" gave rise to a strong inference of scienter); In re MBIA, Inc. Sec. Litig., 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010) (scienter adequately pled based on allegations that corporate officers "had knowledge of and access to non-public information [regarding the company's exposure to real estate assets] that contradicted their public statements"); In re Citigroup Sec. Litig., 753 F. Supp. 2d 206, 238 (S.D.N.Y. 2010) ("Citigroup was taking significant steps internally to address the increasing risk in its CDO portfolio but at the same time it was continuing to mislead investors about the significant risk that those assets posed.  This incongruity between word and deed establishes a strong inference of scienter.").  The Plaintiff is not required to identify specifically the individuals at Citigroup who acted with scienter in order to plead scienter with respect to Citigroup.  See Teamsters Local 445 Freight Div.

22

Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d. Cir.
2008) ("It is possible to raise the required [scienter]
inference with regard to a corporate defendant without doing so
with regard to a specific individual defendant."); In re MBIA,
Inc. Sec. Litig., 700 F. Supp. 2d at 590 ("the fact that Lead
Plaintiff failed to allege scienter for the individual
Defendants does not preclude a finding of recklessness against
MBIA"); Plumbers and Pipefitters Local Union No. 719 Pension
Trust Fund v. Conseco Inc., No. 09 Civ. 6966(JGK), 2011 WL
1198712, at *23 (S.D.N.Y. Mar. 30,2011) ("A finding that the
Complaint fails to allege scienter with respect to any
individual defendant does not necessarily, as a matter of law,
preclude a finding that it adequately alleges scienter with
respect to a corporate defendant. ").

        While Plaintiffs claims are based on Defendants'
misstatements on or before November 12, 2008, the Defendants'
conduct and statements after that date remain relevant to Citi's
scienter during the period on or before November 12, 2008.
Post-purchase events have been considered as evidence of
scienter.  See In re Citigroup Sec. Litig., 753 F. Supp. 2d at
237-38 (stating that certain post-February 2007 events,
including a March 2007 report by a Citi analyst describing the

23

risks that the subprime meltdown posed to COO assets, "support a strong inference that Citigroup officials were at least reckless in not appreciating, by February 2007, the risks posed to the company"); see also United States v. Kelley, 551 F.3d 171, 172 (2d Cir. 2009) (holding that district court did not err in admitting evidence of bogus account statements even though the "statements were sent after the purchases of the securities ... [because] the use of such statements is relevant as evidence to prove, inter alia, the defendant's intent to defraud[.]").  That Citigroup sought and received $326 billion additional TARP infusion and guarantee on November 23, 2008 is relevant to the question of Defendants' knowledge of the risks to Citigroup's liquidity and capital position as of November 12, 2008.

By alleging facts concerning both Citigroup's borrowing from the PDCF in September and October 2008 as well as events that occurred subsequent to Plaintiff's purchase of Citigroup stock, the FAC has presented sufficient evidence of the Defendants' intent to defraud.

C. **Loss Causation Is Inadequately Pled**

To state a claim under Section 10(b) and Rule 10b-5, the Plaintiff must allege an injury that was proximately caused by the alleged misconduct. See 15 U.S.C. § 78u-4(b)(4); Dura Pharm., 544 U.S. at 346-47; see also Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172-73 (2d Cir. 2005). The pleading of loss causation under Section 10(b) is governed by Rule 8 notice pleading standards under which Plaintiffs must plead a short and plain statement of the claim showing that the pleader is entitled to relief. In re Tower Auto. Sec. Litig., 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007). "[A] plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered . . . i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell, 396 F.3d at 173 (internal citations omitted).

Loss causation "is typically shown by the reaction of the market to a 'corrective disclosure' which reveals a prior misleading statement," but "may also be shown by the 'materialization of risk' method, whereby a concealed risk – [such as] a liquidity crisis – comes to light in a series of revealing events that negatively affect stock price over time."

25

In re Vivendi Universal, S.A. Sec. Litig., 765 F. Supp. 2d 512,
555 (S.D.N.Y. 2011); Heller v. Goldin Restructuring Fund, L.P.,
590 F. Supp. 2d 603, 623-24 (S.D.N.Y. 2008).  Here, the
Plaintiff alleges that Citigroup's purported misstatements and
omissions regarding its liquidity, capitalization and the
Wachovia Transaction artificially inflated the stock price and
that the Plaintiff's investment lost value as these
misstatements and omissions were revealed to the market.  FAC ¶¶
19, 20, 22, 23, 28, 39, 41, 42, 55, 57, 59, 60, 62, 63.  To
plead loss causation under this theory, the Plaintiff must show
"both that the loss be foreseeable and that the loss be caused
by the materialization of the concealed risk."  Egan v.
TradingScreen, Inc., No. 10 Civ. 8202(LBS), 2011 WL 1672066, at
*13 (S.D.N.Y. May 4, 2011).  Conclusory allegations are
insufficient to plead loss causation.  See In re Merrill Lynch
Tyco Research Sec. Litig., No. 03 Civ. 4080 (MP), 2004 WL
305809, at *3 (S.D.N.Y. Feb. 18, 2004).

     Regarding Plaintiff's claims concerning liquidity and
capitalization,[3] the Plaintiff, in both the FAC as well as in his

---

[3]    The Plaintiff fails to plead loss causation with respect to
his claims regarding the Wachovia Transaction, and Plaintiff's
opposition makes no argument that loss causation has been pled
with respect to this grouping of alleged misstatements and
omissions.

opposition, has listed a series of five events.  However, the
FAC fails to link these events to any purported materialization
of concealed risks of lack of liquidity or inadequate
capitalization.  See, e.g., In re Merrill Lynch & Co. Research
Reports Sec. Litig., No. 02 Civ. 9690 (JFK), 2008 WL 2324111, at
*7 (S.D.N.Y. June 4, 2008) ("Although plaintiffs need not
quantify the fraud-related loss, they must ascribe some rough
proportion of the whole loss to the alleged misstatements.")
(internal citations omitted).

        First, the Plaintiff highlights that, on November 17,
2008, Citigroup announced that it was moving $80 billion in
assets into a "held for investment, held for maturity, or
available for sale category," indicating that the assets would
no longer be marked to market, thereby acknowledging that they
were illiquid and had no value.  FAC ¶ 41.  Second, the
Plaintiff then notes that, on November 19, 2008, Citigroup
announced that it would "buy the last $17.4 billion in assets
held by its structured investment vehicles, which were among the
first casualties when the credit crunch hit last year."  FAC ¶
43.  While the FAC links these two announcements with a decline
in stock price, the Plaintiff has not linked disclosures to a
materialization of any purported concealed risk.

27

Third, the Plaintiff has referred to a November 21, 2008 conference call between Federal Reserve and Citigroup officials, and how, in the words of the TARP Report, "[i]n the market, the lack of confidence in Citigroup was stressing its liquidity – there was a run on Citigroup's foreign deposits, and counterparties had stopped providing the institution with wholesale funding." FAC ¶ 50.  Thus, the FAC seems to link Citigroup's liquidity crisis with a lack of confidence in the firm, rather than attributable to the materialization of a risk Defendants concealed in the fall of 2008.  See In re QLT Inc. Sec. Litig., 312 F. Supp. 2d 526, 536 (S.D.N.Y. 2004) ("[I]f an intervening cause supercedes the effects of an initial misrepresentation, then a Section 10(b) claim fails.").

The fourth and fifth events Plaintiff relies upon are Citigroup's January 2009 announcement of its plan to sell the Smith Barney brokerage business and Citigroup's January 16, 2009 fourth quarter announcement of additional write-downs and losses.  Again, the FAC fails to explain how these events relate to Citigroup's liquidity or capital position.  Although the Plaintiff seeks to link these five events with corresponding declines in stock price, the Plaintiff's chart of stock prices

28

between November 13 and January 29, 2009 and the events noted
reveal a series of events not necessarily related to the earlier
alleged misstatements or omissions.

The FAC thus fails to establish that the Plaintiff's
losses have been caused by the materialization of the liquidity
and capitalization risks the Defendants allegedly concealed.
Accordingly, the Plaintiff's Section 10(b) and Rule 10b-5 claim
is dismissed in its entirety.

## Defendants' Motion To Dismiss Count Two Is Granted

Count Two of the FAC alleges a violation of Section
20(a) of the Exchange Act against Pandit.  To establish a prima
facie case of control person liability, a plaintiff must show
(i) a primary violation by the controlled person, (ii) control
of the primary violator by the defendant, and (iii) that the
controlling person was in some meaningful sense a culpable
participant in the alleged fraud perpetrated by the controlled
person.  See ATSI Commc'ns, 493 F.3d at 108; Boguslavsky v.
Kaplan, 159 F.3d 715, 720 (2d Cir. 1998).  Because the Plaintiff
has failed to plead a primary violation of the securities laws,
his control-person claim is also dismissed.

29

**Defendants' Motion To Dismiss Count Three Is Granted**

Count Three of the FAC alleges common law fraud against both defendants.  To state a claim for common law fraud under New York law, a plaintiff must demonstrate "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which plaintiff reasonably relied; and (5) which caused injury to plaintiff." In re Optimal U.S. Litig., No. 10 Civ. 4095, 2011 WL 1676067, at *16 (S.D.N.Y. May 2, 2011).  "The elements of fraud under New York law are essentially the same as those for a claim of securities fraud under Section 10(b) and Rule 10b-5." Serova v. Teplen, No. 05 Civ. 6748(HB), 2006 WL 349624, at *8 (S.D.N.Y. Feb. 16, 2006).  Common law fraud, like securities fraud, is subject to heightened pleading standards.  See Fed. R. Civ. P. 9(b).  Similar to the FAC's securities fraud claim, the common law fraud claim fails to establish causation and is therefore dismissed.  See, e.g., Marcus v. Frome, 275 F. Supp. 2d 496, 503 (S.D.N.Y. 2003) (dismissing common law fraud claims where plaintiff failed to satisfy the pleading requirements of 10b-5 claim).

**Conclusion**

30

Based on the conclusions set forth above, the FAC is dismissed.  Leave to replead within twenty days is granted.


It is so ordered.


**New York, NY**
**November 2 2, 2011**

_____
        **ROBERT W. SWEET**
          **U.S.D.J.**