

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHELDON H. SOLOW,<br><br>                    Plaintiff,<br><br>          -against-<br><br>CITIGROUP, INC. and VIKRAM<br>PANDIT,<br>                    Defendants. | 10 cv 02927 (RWS)<br><br>**SECOND AMENDED COMPLAINT**<br><br>ECF Case |

Plaintiff Sheldon H. Solow alleges, for his Second Amended Complaint, with knowledge as to his own actions and events occurring in his presence, and upon information and belief as to other matters, as follows:

## SUMMARY OF THE ACTION

1.      This action arises from Citigroup, Inc.'s ("Citigroup") efforts to conceal the fact that it was in a death spiral beginning in the fall of 2008. Even as it teetered on the edge of total collapse — notwithstanding massive secret borrowing from the Federal Reserve — Citigroup repeatedly assured investors that its liquidity and capital position were strong. In fact, Citigroup's liquidity and capital position were rapidly deteriorating.

2.      In November 2008, with its survival in question, Citigroup was forced to request massive emergency assistance from the United States government. Even after receiving an unprecedented $326 billion government bailout in late November 2008 that provided it with additional capital and access to liquidity, Citigroup's liquidity and capital position continued to deteriorate.

3.      A secret January 14, 2009 Federal Reserve inspection report of Citigroup as of December 31, 2008 (attached hereto as Exhibit A) provides an unvarnished picture of Citigroup's capital and liquidity position at the time, including the following highlights:

- Citigroup's *"superficially well-capitalized position masks a series of underlying weaknesses* . . . the firm is likely to experience substantial credit deterioration, *which brings into question the adequacy of the firm's capital base going forward."* Ex. A at 3.

- Citigroup *"has a material chance of falling below the well-capitalized threshold."* *Id.*

- *"Citigroup's liquidity has been downgraded to 'unsatisfactory' . . . as the funding position of the firm remains at risk* and immediate steps are needed to address liquidity vulnerabilities." *Id.* at 5.

- *"[D]eposit outflows of approximately $25 billion in late November and early December 2008 posed a significant risk to the firm* [and] [u]nder a plausible deposit runoff scenario the lead bank would exhaust its cash resources in only a few days." *Id.* at 6.

4.      Beginning in the fall of 2008, Citigroup knew — but did not disclose — the material risk that it could fall below the "well-capitalized" threshold because of continuing write downs on tens of billions of dollars in toxic mortgage-related assets.  Citigroup knew — but did not disclose — that its liquidity was eroding (and the risk that it could evaporate entirely) because, among other things, its foreign depositors were rapidly withdrawing their deposits (which constituted the majority of Citigroup's deposit base).  Nor did Citigroup disclose the fact that it obtained hundreds of billions of dollars of loans from the Federal Reserve's emergency facilities that were intended to assist financial institutions (such as Citigroup) that lacked access to liquidity.

5.      Rather, throughout the fall of 2008, Citigroup and its Chief Executive Officer, defendant Vikram Pandit ("Pandit") repeatedly assured investors that it had strong liquidity, strong capital, and ample deposits.  These representations were false.

6.      Investors relied on Citigroup's representations.  One of these investors was Plaintiff, Sheldon H. Solow, who made substantial purchases of Citigroup shares in late September and early November 2008.  Plaintiff sold his Citigroup shares in March 2009, at a loss of 87%.  This loss was caused by Citigroup's fraud, and the resulting fraud on the market for Citigroup stock.

7.      Plaintiff's Second Amended Complaint asserts three causes of action: (1) a claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Citigroup and Pandit (together, "Defendants") arising out of a scheme to fraudulently increase the market price for Citigroup shares; (2) a claim under Section 20(a) of the Exchange Act against Pandit for control person liability; and (3) a claim against Defendants for common-law fraud.

## JURISDICTION AND VENUE

8.      This action is brought pursuant to Section 10(b) of the Exchange Act, as amended, 15 U.S.C. § 78(j)(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

9.      The Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §§ 1331 and 1367.  Venue is proper in this district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).

10.     Venue is proper in this district because the parties are located in this district.

## PARTIES

11.     Plaintiff Sheldon Solow is a resident of the State of New York.

12.     Defendant Citigroup is a Delaware corporation with its principal place of business in New York, New York.

13.     Defendant Pandit is the Chief Executive Officer of Citigroup.

## FACTUAL ALLEGATIONS

### I.     CITIGROUP'S FALSE AND MISLEADING STATEMENTS

#### Citigroup's Representations As To Its Capital and Liquidity Strength In the Fall of 2008

14.     On September 15, 2008, Lehman Brothers filed for bankruptcy.  The Dow Jones Industrial Average dropped 504.49 points - or 4.4% of its total value - on that day alone.  Citigroup's stock fell $2.72 on that day – 15.1 % of its total value.

15.     To boost investor confidence, Pandit issued a memorandum on September 15, 2008, to all Citigroup employees urging them to "remind our clients and shareholders," among other things, that Citigroup's "capital ratio" was "well in excess of the 'well-capitalized' regulatory minimums," and that Citigroup's "cash position is very strong. Citigroup continues to boast a strong deposit base that is diversified across products and regions." *Pandit's Memo to Citigroup Employees*, Wall Street Journal, Sept. 15, 2008.

16.     Pandit's memorandum was widely publicized.  Dow Jones Newswire reported on September 15, 2008 that Pandit told Citigroup employees that "Citigroup has large international and domestic base of deposits which should provide it with a 'low-cost source of funding.'"

17.     On September 29, 2008, Citigroup announced that it was acquiring all of the banking subsidiaries of the Wachovia Corporation.   In reliance on Citigroup's representations as to its strong capital and liquidity position at the time and the prospects of the Wachovia deal, Plaintiff purchased 10,000 shares of Citigroup common stock on September 30, 2008, at $21.02 per share, for an aggregate price of $210,239.

18.    On October 3, 2008, the market learned that Citigroup's Wachovia deal would not go forward when Wachovia announced that it had entered into a deal with Wells Fargo instead of Citigroup.

19.    Despite the failed deal, Citigroup continued to represent that it had strong liquidity, deposits, and capital.  "With or without this transaction, Citi maintains an unmatched, globally dominant franchise with strong liquidity, total deposits exceeding $800 billion and a Tier 1 capital ratio of 8.7% as of the second quarter." Citigroup Press Release, "Citi Statement on Wachovia's Breach of Exclusivity Agreement," Oct. 3, 2008.

## Citigroup's Massive Undisclosed Borrowings From The Federal Reserve's Emergency Lending Facilities

20.    At the same time that Citigroup represented itself to be an "*unmatched, globally dominant franchise with strong liquidity*," *see* ¶ 19, supra, it was secretly borrowing hundreds of billions of dollars from the Federal Reserve.  In fact, Citigroup's liquidity and access to funding was evaporating.

21.    In late 2007 and 2008, the Federal Reserve authorized a series of emergency lending facilities, such as the Primary Dealer Credit Facility ("PDCF"), designed to help banks in distress.  Fearful of putting a "stigma" on banks that were borrowing from the emergency facilities, the Federal Reserve did not disclose the names of the borrowing banks. As the Federal Reserve explained, its policy of nondisclosure "is very important to institutions that borrow from the . . . PDCF because of the stigma that is associated with borrowing from the 'lender of last resort' – the back up source of liquidity for *institutions*

***that are unable to access short-term funding in the market***, whether for operational or other reasons."[1]

22.     Plaintiff had no reason to doubt Citibank's representations that it had strong liquidity, capital strength, and ample deposits.  Based on Citigroup's representations, Plaintiff believed Citigroup was weathering the financial crisis and made substantial purchases of Citigroup shares.

23.     In fact, Citigroup was massively borrowing from the Fed's emergency facilities.  According to Federal Reserve data that was released in 2010, Citigroup and its subsidiaries borrowed over $740 billion during 2008.  Significantly, nearly $450 billion of these borrowings occurred in September and October 2008 alone.

24.     Citigroup's dependence on emergency Federal Reserve funding facilities reached astonishing levels in September and October of 2008.  For example, Citigroup's broker-dealer subsidiary, Citigroup Global Markets, Inc., borrowed heavily from the PDCF as indicated below:

| **Date Range** | **Number of Loans** | **Total Borrowings** |
| --- | --- | --- |
| March 18 – August 30, 2008 | 22 | $37.8 Billion |
| September 1 – 30, 2008 | 12 | $126.5 Billion |
| October 1 – 31, 2008 | 22 | $312.9 Billion |

*See* http://www.federalreserve.gov/newsevents/reform_pdcf.htm

25.     Had Plaintiff known about this massive emergency borrowing — which confirmed Citigroup's inability to access short-term funding in the private market — he would not have purchased Citigroup shares.

---

[1]   Declaration of Susan E. McLaughlin (Senior Vice President at Federal Reserve Bank of New York), dated March 1, 2009 (submitted in *Bloomberg L.P. v. Board of Governors of the Federal Reserve System*, No. 08-cv-9595 (LAP) (S.D.N.Y.)) (emphasis added).

**The TARP Capital Injection Fails To Stop The Bleeding At Citigroup**

26.     On October 14, 2008, the U.S. Treasury injected $125 billion of capital into the nine largest banks under the federal Troubled Asset Relief Program ("TARP"). Citigroup received $25 billion of this TARP money.   Notwithstanding this capital injection, Citigroup continued to hover on the brink of collapse.

27.     As was revealed by the Special Inspector General for TARP in a January 2011 report entitled *Extraordinary Financial Assistance Provided to Citigroup, Inc.* (the "TARP Report"), "Citigroup suffered significant instability shortly after receiving the initial $25 billion TARP investment."   TARP Report at 2-3.   The report concluded that: "Even though [Citigroup] had received $25 billion from TARP's Capital Purchase Program just weeks earlier, it was the subject of a global run on its deposits, its stock was in a nosedive as short sellers sought to profit on the market's perception of its deteriorating condition, and the cost of insuring its debt in the credit default swap market was increasing at an alarming pace compared to its peers." *Id.* at 41.

28.     On October 16, 2008, two days after Citigroup received the $25 billion capital infusion from the U.S. Government through TARP, Citigroup issued a press release announcing a net loss of $2.8 billion for the third quarter of 2008, including $4.9 billion in write-downs and credit losses.   Nevertheless, Pandit once again assured shareholders that "[w]e ended the quarter with a very strong Tier 1 ratio of 8.2% and a loan loss reserve of $25 billion. Our capital will be further strengthened by the sale of our Germany retail banking operations in the fourth quarter, continued focus on reducing our legacy assets, as well as the latest steps taken by the U.S. Department of the Treasury."

29.     On October 31, 2008, Citigroup filed with the SEC its 10-Q for the third quarter of 2008, in which it reported $2.05 trillion dollars in total assets as of September 30, 2008.   Citigroup Inc. Form 10-Q filed with the SEC on October 31, 2008, at 82. Citigroup continued to represent that it "maintained its 'well-capitalized' position," *id.* at 6, and continued to reiterate its prior liquidity representations by stating: "***Our liquidity position also remained very strong during the third quarter of 2008 and will continue to be enhanced*** through the sale to the U.S. Department of the Treasury of perpetual preferred stock and a warrant to purchase common stock, the sale of the German Retail Banking Operations and continued balance sheet de-leveraging.  At September 30, 2008, we had increased our structural liquidity (equity, long-term debt, and deposits), as a percentage of assets, from 55% at September 30, 2007 to approximately 64% at September 30, 2008." *Id.* at 7.  Citigroup's filing also stated: "Continued de-leveraging and the enhancement of our liquidity position have allowed us to continue to maintain sufficient liquidity to meet all debt obligations maturing within a one-year period without having to access unsecured capital markets." *Id.*

30.     Due, in great part, to these continuing representations of its capital and liquidity strength, Citigroup's stock sold at an inflated price of $9.88 per share when Plaintiff purchased an additional 30,000 shares of Citigroup common stock on November 12, 2008, for an aggregate price of $299,421.

31.     On November 14, 2008, in a memo to Citigroup employees, Pandit stated that Citigroup's "capital is plentiful" and that the bank had an "abundance of liquidity." *Pandit, in Memo, Tries Reassuring Citi Employees*, Wall Street Journal, Nov. 14, 2008.

## II.  THE PUBLIC MATERIALIZATION OF CITIGROUP'S CAPITAL AND LIQUIDITY RISKS CAUSES A DRAMATIC LOSS IN CITIGROUP'S MARKET PRICE

32.    Notwithstanding Pandit's statement, beginning in mid-November a series of disclosures called into question the purported strength of Citigroup's capital and liquidity position.

33.    On November 17, 2008, at a town hall-styled meeting with its employees, the Company revealed:  "we are moving or plan to move in the fourth quarter of 2008, approximately $80 billion of . . . legacy assets into a held for investment, held to maturity or available for sale category," thereby "reduc[ing] the earnings volatility that these assets could pose."   November 17, 2008 Town Hall- Podium Copy Speaking Notes, http://www.citigroup.com/citi/fin/data/spn081117a. pdf at 12.

34.    By moving the $80 billion in assets into a "held for investment, held to maturity or available for sale category," Citigroup would no longer be required to mark such assets down to market – a near-certainty in light of the plunging prices (and illiquidity) of asset-backed securities during the fourth quarter of 2008.  As one analyst report explained:

> [Citigroup] still has the largest exposure to mark-to-market risky assets among the group [of Goldman Sachs, Merrill Lynch, Morgan Stanley, JPMorganChase, and Bank of America].  For example, total net exposures within the investment bank to subprime CDOs, bond insurers, residential mortgages, commercial mortgages, and leveraged loans totaled $70bn as of 3Q08, double that of the next largest competitor . . . Given the dramatic sell off in most asset classes this quarter, *we see substantial write-down risk for [Citigroup] in 4Q08*.  For instance, many of the ABX indices are down 40%-50%, CMBS securities are down 15%-20%, leveraged loans are off a similar 15%-20%, and residential MBS securities are off 10%-20%.  Considering these declines and sizable exposures, there remains

> significant near-term mark-to-market risk . . . *Of course,*
> *[Citigroup] is looking to alleviate this mark-to-market risk*
> *by moving these assets into held to maturity or available for*
> *sale portfolios, but 4Q8 risks remain.*

*The Buckingham Research Group*, Citigroup (Dec. 10, 2008), at 5-6.   As another analyst

succinctly put it:  "The bank plans to reclassify $80 billion of legacy assets, *so that*

*quarterly mark-to-market adjustments will no longer be required* . . ."  Kathleen Shanley,

*Gimme Credit*, November 20, 2008.

35.     The market recognized that Citigroup was seeking to reclassify $80 billion

of toxic assets to avoid further writedowns on those assets (and the reduction in capital

levels which such writedowns entailed), raising questions as to whether Citigroup expected

writedowns of *other toxic assets* held on or off balance sheet.

36.     Indeed, in the fall of 2008, Citigroup held massive positions in "toxic" sub-

prime assets on its balance sheet that were marked to market.  Citigroup did not disclose

the specific toxic securities that it held or the extent to which it anticipated marking down

their value.  Citigroup knew (but did not disclose) the risk that if the market value of these

assets eroded, its Tier 1 capital ratio would materially decline.  Given this undisclosed risk,

it was misleading for Citigroup to tout the fact that its Tier 1 Capital ratio exceeded

regulatory minimums.

37.     Even before the fall of 2008 regulators had secretly warned Citigroup that it

needed to "focus" on the risk that its sub-prime exposures posed to its capital levels.  In

February 2008, the Office of the Comptroller of the Currency secretly warned Pandit that

"[a]nalysis of risk versus capital is lacking" and that Citigroup "should have increased

focus on capital and risk levels, particularly as broader indicators of weaknesses in sub-

prime lending became known in the first quarter of 2008." *Letter From John C. Lyons, Examiner-in-Charge, Large Bank Supervision to Mr. Vikram Pandit*, Feb. 14, 2008.

38.     As one analyst explained, "[Citigroup] ha[s] a huge book of consumer loans and securities that nobody knows what they're worth. ***They're going to have to continue taking losses, and is there really enough (capital) to support that?    The answer is probably no***." "Citi Works To Assure Investors; After Stock Battered, A Show of Resilience," *Washington Post*, Nov. 22, 2008.   Another analyst commented: "***As we're watching the deterioration here of the market . . . it makes us think that the mark-to-market write-offs are not over yet***." Citi's Slide Deepens as Investors Bail Out, *Wall Street Journal*, November 20, 2008.

39.     Not surprisingly, Citigroup's November 17 announcement ignited a dramatic sell-off in Citigroup stock from an open of $9.36 per share that day to a close of $3.77 per share by week's end, a decline of 61%.

40.     On November 19, 2008, Citigroup announced that it would acquire assets of Citi-advised SIVs for $17.4 billion.   In a stark illustration of the plummeting values of mortgage assets, Citigroup noted that the SIVs had experienced "a decline in market value of $1.1 billion since the end of the third quarter 2008," *i.e.*, in less than two months. Citigroup further conceded that as a result of this transaction, "*risk-weighted assets will be increased by approximately $2 billion.*"

41.     As Citigroup effectively conceded, pulling $17.4 billion in toxic assets onto its balance sheet reduced Citigroup's Tier 1 capital ratio, which is calculated by dividing qualifying capital by risk-weighted assets. *See* 12 C.F.R. § 325.103(b)(1).   By increasing

the denominator (risk-weighted assets) by approximately $2 billion, the transaction by definition lowered Citigroup's Tier 1 capital ratio.

42.     The market recognized that Citigroup's writedowns of assets consolidated onto its balance sheet were eroding its capital adequacy.  As one report explained:

> Citibank completed the consolidation of seven SIVs, with assets worth US $17.4 billion . . . This increased its risk-adjusted assets by $US2 billion.  The crisis wrought a double whammy on banks that had played the off-balance sheet game.  As they consolidated SPEs into their balance sheet, the assets of their balance sheet rose, with the increase weighted towards relatively risky investments, with higher risk adjustments. ***Hence, on the liabilities side, banks had to provide proportionately more capital to meet their capital adequacy ratio.***

*Off The Balance Sheet, Then On Again*, Straits Times, Dec. 30, 2008.

43.     Citigroup had tens of billions of dollars in toxic assets on its balance sheet and tens of billions of dollars in toxic assets off balance sheet that it might need to bring on balance sheet.  Writedowns of the value of these assets increased their "risk weighting" for regulatory capital purposes; as a result, Citigroup's risk-weighted assets increased, and, by definition, its Tier 1 capital ratio declined.  As the writedowns multiplied, Citigroup's Tier 1 capital ratio would erode.   The result, as one commentator noted, was ***the U.S. government would need to write "$25 billion checks on a quarterly basis for the foreseeable future.  There would be no end in sight since the amount of toxic waste residing on Citigroup's balance sheet . . . is in the tens of billions and currently unknown***." Roger Ehrenberg, *Playing Chicken With Citigroup*, Newstex, Nov. 20, 2008.

44.     Not surprisingly, as *The Wall Street Journal* reported: "Investors were rattled by the New York company's announcement that it will buy the last $17.4 billion in assets held by its structured investment vehicles, which were among the first casualties

when the credit crunch hit last year." *Citi's Slide Deepens as Investors Bail Out,* Wall Street Journal, Nov. 20, 2008. Indeed, Citigroup's shares entered a "free fall," nose-diving 23% from $8.33 per share to $6.40 per share in one day.

45.     Nevertheless, on November 20, 2008, Citigroup told the market that it had a "very strong capital and liquidity position."

**Citigroup Requests Emergency Assistance From The U.S. Government**

46.     While Citigroup was making unequivocal, positive statements to the press and public, it was secretly giving the U.S. Treasury Department the opposite account of its capital position and liquidity. On November 19, 2008 (as revealed in an account published in 2010), Treasury Secretary Henry M. Paulson advised President Bush that Citigroup was "teetering on the brink of failure." Henry M. Paulson, *On the Brink,* at 402 (Business Plus 2010). President Bush was shocked: "I thought the programs we put in place had stabilized the banks," to which Secretary Paulson responded: "I did, too, Mr. President, but we are not out of the woods yet . . . Citi has a very weak balance sheet."

47.     As the TARP Report later revealed, during a November 21, 2008 conference call between Federal Reserve and Citigroup officials, "it became clear the risk profile of Citigroup was increasing rapidly, and liquidity pressures had reached crisis proportions." TARP Report at 17. As the TARP Report explained: "there was a run on Citigroup's foreign deposits, and counterparties had stopped providing the institution with wholesale funding." *Id.* at n.37.

48.     Significantly, the majority of Citigroup's deposits were located overseas. Thus, a run on Citigroup's foreign deposits would rapidly drain Citigroup's liquidity and immediately cripple the firm. As Secretary Paulson later explained, Citigroup was the

*"weakest of the major U.S. banks'*; because it had only modest domestic deposits." Paulson, *On the Brink*, at 403 (emphasis added). Secretary Paulson further explained that Citi had "$500 billion of foreign deposits. Because foreign deposits were not protected by FDIC insurance, that money was more likely to run to avoid the risk of a bank failure, a major reason *Citi's liquidity was likely to evaporate in a few days*." *Id.* at 412 (emphasis added).

49.     On November 21, an FDIC examiner reported that "cash lock-ups" imposed upon Citigroup by the United Kingdom's Financial Services Authority ("FSA") "could be very damaging to Citi's liquidity, especially if other foreign regulators follow the FSA's lead." In response to these and other issues an FDIC Senior Deputy Director expressed a sentiment, which evidenced the misleading nature of Citigroup's previous statements: "In short, I will characterize the liquidity and confidence situation as negative and deteriorating such that viability may be threatened without outside support." The next day Arthur Murton of the FDIC sent an e-mail stating that Citigroup's "immediate risk" was liquidity.

50.     As a Treasury official later testified: "Citi was in a position where it was – and it did communicate this to Treasury, I know this – that they could have difficulty funding themselves at that time." *Hearing Before The Congressional Oversight Panel*, March 4, 2010, at 27.

51.     Facing a liquidity crisis, Citigroup secretly requested that the government expand its access to the Federal Reserve's emergency liquidity facilities, such as the PDCF. Citigroup desperately requested that the Federal Reserve permit Citigroup to post

toxic assets as collateral for borrowings from the Fed's emergency lending facilities, such

as the PDCF. As an internal FDIC memorandum noted:

> Current requests by Citigroup to the Federal Reserve to expand the Commercial Paper Funding Facility and to expand collateral and entities eligible for posting to the [PDCF] and the Term Securities Lending Facility (TSLF) would provide short-term funding relief . . . ***However, the collateral, as described in the request letter to the Federal Reserve, is of lower credit quality or weaker underwriting standards. It appears that the volume of collateral pledged would not be sufficient and that the Federal Reserve would not be willing to accept the collateral without a substantial haircut.***

Memorandum From James Wigand, Deputy Director of FDIC to FDIC Board of Directors,

Nov. 23, 2008, at 6.

52.      Significantly, as the FDIC memorandum noted, even if the Federal Reserve

expanded Citigroup's access to existing liquidity programs, any "incremental liquidity"

would "not be sufficient to withstand extensive deposit runoff." *Id.*

53.      Citigroup also secretly requested that the government provide a $306 billion

guarantee for its commercial mortgages, subprime bonds, and other toxic assets. *Id.*

Citigroup requested "***capital forbearance***" on these $306 billion in assets — an implicit

(and undisclosed) acknowledgment that writedowns on Citigroup's portfolio of toxic assets

would materially impact its capital ratios. TARP Report at Appendix I (emphasis added).

Indeed, the FDIC estimated that the $306 billion in assets subject to the proposed

guarantee included ***$38 billion in "embedded credit losses,"*** further confirming that more

writedowns were coming. *Id.* at 30 n. 62 (emphasis added).

54.      On November 23, an internal FDIC memorandum stated that "[t]he risk

profile of [Citibank] is increasing rapidly due to the market's lack of confidence in the

company and a substantially weakened liquidity position.  Liquidity has reached *crisis proportions*, such that Citibank is projected to be unable to meet its obligations."  Despite Citigroup's representation only days earlier that it had "a strong capital and liquidity position," the memorandum reiterated that "[l]iquidity pressures have reached crisis proportions, such that Citigroup and its five insured entities will be unable to meet obligations.  Staff projects that Citigroup will be unable to pay obligations or meet expected deposit outflows during the week beginning November 24, 2008 if there is not a systemic risk determination and implementation of proposed measures to improve market perception on Monday morning."

55.     As the FCIC Report later revealed, "Citigroup's own calculations suggested that a drop in deposits of just 7.2% would wipe out its cash surplus.  If the trend of recent withdrawals continued, the company could expect a 2% outflow of deposits per day. Unless Citigroup received a large and immediate injection of funds, its coffers would be empty before the weekend."  FCIC Report at 380.

56.     Notably, FDIC Chair Sheila Bair recognized that Citigroup's problems were not simply reflections of poor market conditions.  Bair told the FDIC Board that "Citigroup's underlying problems [were] deeper than being merely reflective of general market conditions [and] . . . Citigroup has certain problems very specific to itself . . ." FDIC Board of Directors Meeting Minutes, Nov. 23, 2008.  Indeed, Citigroup's stock performed significantly worse than other banks during the relevant period.

57.     Based on these findings the FDIC staff recommended to the FDIC Board of Directors in a closed meeting on November 23 to inject further TARP funds into Citigroup. At the meeting, FDIC Chairwoman Blair explained that: "We were on the verge of having

to close this institution because it can't meet its liquidity Monday morning." TARP Report at 14.

**The $326 Billion Bailout Of November 2008 Prevents Citigroup's Collapse**

58.     On November 23, 2008, Citigroup agreed to the government's massive bailout proposal, which included the $20 billion capital infusion from TARP funds and a $306 billion guarantee for Citigroup's troubled assets.

59.     In a November 24, 2008 press release, Citigroup boasted that the bailout provided "$40 billion in capital benefits." The press release acknowledged that of the $40 billion in capital benefits, $16 billion derived from the government's agreement to provide favorable capital treatment to the $306 billion portfolio of toxic assets that Citigroup requested the government to guarantee. As the press release stated, "[a]s a result of the asset guarantee, *the $306 billion portfolio will have a new risk weighting of 20%,* thus freeing up an additional $16 billion of capital to the company." The clear implication of this disclosure was that *prior to the bailout*, the $306 billion portfolio had a risk weighting of *more than 20 percent* and thus contributed more to Citigroup's total risk-weighted assets.

60.     In other words, without the government's agreement to the "new" 20 percent risk weighting, Citigroup's Tier 1 Capital ratio would have been lower. By thus explicitly linking the "risk weighting" of its toxic assets to its capital levels, Citigroup confirmed (as the market feared) that deteriorations in its portfolio of toxic assets could result in a lower Tier 1 capital ratio.

61.     Further, in an implicit acknowledgement of its liquidity difficulties, Citigroup noted that the government provided it with "expanded access to both the Federal Reserve's Primary Dealer Credit Facility and the discount window, resulting in strong

additional liquidity resources should they be needed." Citigroup continued, however, to make no disclosure of the material fact that it had *already* borrowed hundreds of billions of dollars from the PDCF.

62.    Given the additional capital and liquidity that the government provided, Citigroup stock managed to rise for the week. The market hoped that the erosion of Citigroup's capital and liquidity would abate. However, the market's concerns returned as analysts dissected the fine print of the bailout.

63.    Under the terms of the November 2008 government bailout, Citigroup was required to cover the first $29 billion in losses on the $306 billion in guaranteed assets (Citigroup's "first loss" responsibility was later increased to $39 billion). The market realized that Citigroup would continue to experience losses on the portfolio of toxic assets, notwithstanding the government "guarantee," and that Citigroup's capital levels would continue to erode. As one commentator noted:

> Now that Citigroup Inc. has secured yet another taxpayer bailout, where are the writedowns? You don't have to be that smart to figure out there's still a lot of rot on Citigroup's $2.1 trillion balance sheet. If there wasn't, the New York-based lender wouldn't have needed last week's government rescue, which included a new $20 billion investment by the Treasury Department, plus a guarantee covering about $306 billion of the bank's assets against most losses. . . *One reason we know Citigroup is anticipating huge losses is that the terms of its latest bailout agreement envision them. Citigroup is responsible for the first $29 billion of losses in the government-guaranteed portfolio, which includes loans and securities backed by residential and commercial real estate. The government will assume 90 percent of any other losses, with Citigroup taking the rest.*

Citigroup Needs to Confess Its Writedowns Now, *Bloomberg*, Dec. 4, 2008, by Jonathan Weil.

64.     Indeed, the Federal Reserve was secretly telling Citigroup what the market suspected: Citigroup's "*superficially well-capitalized position masks a series of underlying weaknesses . . . the firm is likely to experience substantial credit deterioration, which brings into question the adequacy of the firm's capital base going forward.*" Ex. A at 3. Further, Citigroup "*has a material chance of falling below the well-capitalized threshold.*" *Id.*

65.     On January 9, 2009, *The New York Times* reported that Citigroup was considering "a possible deal to sell a share of its prized [Smith Barney] retail brokerage business," which "highlighted" Citigroup's "*desperate need to raise capital.*"   *Rubin Leaving Citigroup; Smith Barney for Sale,* New York Times, Jan. 10, 2009.  This event was part of a series of revelations that unmasked Citigroup's liquidity and related risks, and understandably caused the market to react precipitously.   Indeed, in just 10 days, the market value of Citigroup stock, including Plaintiff's stock, plummeted 58.5% (from the close of $6.75 on January 10th to the close of $2.80 on January 20th).

66.     As *The New York Times* reported on January 12, 2009: "Shares of Citigroup, which had regained their footing after two recent lifelines from Washington, plunged 17 percent, to $5.60, as investors worried that [the announcement of the Smith Barney sale] was a sign the bank's troubles may again be deepening. Wall Street analysts say they believe regulators are pushing Citigroup to sell its brokerage unit because the company desperately needs cash." *A Cash Machine Runs Low*, New York Times, Jan. 13, 2009.

67.     And the revelations about Citigroup's illiquidity, including the illiquidity associated with owning vast amounts of illiquid "toxic" assets, continued.  On January 14,

*Business Week* reported that "[a]ll of Citi's recent posturing may be obfuscating the real issue: the bank's portfolio of toxic assets, which is becoming increasingly troublesome . . . According to some estimates, the toxic assets on the books . . . could stand at $150 billion." *Citigroup: Let the Breakup Begin*, Business Week, Jan. 14, 2009. On January 14, 2009, Citigroup's share price dropped from its previous day's close of $5.90 to $4.53 per share; it dropped again to $3.83 the following day.

68.     On Friday, January 16, 2009, Citigroup dropped a bombshell with its fourth quarter earnings announcement: an $8.29 billion net loss and further write-downs of approximately $5.6 billion. Citigroup Form 8-K, Jan. 16, 2009, Ex. 99.1 at 1.  As these revelations made clear, Citigroup's capital, and thus liquidity, was continuing to deteriorate as it wrote down the value of its massive portfolio of its toxic assets.

69.     Not surprisingly, in the January 16 earnings call, analyst Guy Moszkowski of Bank of America highlighted Citigroup's "need for capital" and that its capital levels "seem thin."  Moszkowski asked: *"Do you have any capital raising plans?  How do you think you can avoid that type of thought process for people?*  Another analyst issued a report on the same day entitled *"4Q08: Little Margin for Error Left"* which stated: *"[Management] needs to sell business units fast, in our view, to build capital before another big quarterly loss emerges."*  David Trone, Fox-Pitt Kelton Cochran Caronia Waller Report on Citigroup, Jan. 16, 2009.  One analyst remarked: *"[b]ankruptcy will probably be the end game."*  *Bloomberg News,* Interview of Christopher Whalen, Jan. 16, 2009.

70.     Even more ominously, the January 16, 2009 8-K filing revealed that massive outflows of Citigroup's foreign deposits had occurred during the fourth quarter of

2008. *Deposits fell 28% in Europe, Middle East and Africa, 13% in Latin America, and 9% in Asia*. For a firm that relied so heavily on foreign deposits to fund its operations and liquidity, these figures represented a mortal liquidity danger.

71.     Indeed, the gravity of Citigroup's revelation was consistent what the Federal Reserve was privately telling Citigroup in its January 14, 2009 inspection report: "foreign-based deposits displayed a high level of outflow during the firm's recent stress period and the firm is reliant on foreign deposits to fund a substantial portion of its U.S. dollar-denominated domestic assets. *Deposit outflows of approximately $25 billion in late November and early December 2008 posed a significant risk to the firm*." Ex. A at 6. Given these developments, it is no surprise that the Fed rated Citigroup's liquidity as "unsatisfactory," which represented the lowest possible rating. *Id.* at 5.

72.     The market continued to absorb and recognize the gravity of Citigroup's revelation and linked the outflow of foreign deposits to liquidity problems. As the *American Banker* noted, "new data shows consumers yanked deposits in Latin America, Europe, the Middle East, Africa and Asia in the fourth quarter . . . Citi's problems are clearly affecting its ability to raise and hold deposits." *American Banker*, January 21, 2009. CBS News reported that "[m]ost of the money flight involved depositors in Latin America, Europe, the Middle East and Africa dumping Citi because of fears of its viability," noting that "the trend pours cold water on the conceit of many large financial institutions like Citi which boast of their global nature as being a big hedge against downturns. Not the case this time around." *For Evidence of Bank Health, Follow the Deposits*, CBSNews.com, Jan. 21, 2009. Given that Citigroup had over $500 billion of foreign deposits, the market realized that a meaningful "run on the bank" abroad could

swamp Citigroup's available liquidity.  As one commentator noted, "a deposit run would be those whose balances exceed FDIC guarantees  . . . and foreign depositors . . . Citi has a LOT of foreign deposits as in . . . over half a trillion (this relative to a balance sheet of $1.9 trillion)." *Naked Capitalism,* Feb. 22, 2009.

73.     The materialization of Citigroup's liquidity risks during this period through a combination of reports by major media (such *The New York Times*, *CBS News*, and *American Banker)* and belated corrective disclosures by Citigroup (in its 8-K filed on January 16, 2009), caused the market price of Citigroup stock (including Plaintiff's) to plunge almost 60% between January 10th and January 20th.

74.     Citigroup had misrepresented and withheld the extent of its capital strength and liquidity from the market, and from Plaintiff, when Plaintiff purchased his Citigroup stock on September 30, 2008 and November 12, 2008, at prices inflated by Citigroup's misrepresentations and material omissions. Citigroup continued to misrepresent and conceal its financial state while Plaintiff retained that stock.

75.     Even after Citigroup's liquidity risks materialized, Citigroup continued to try and conceal the full magnitude of the risk.  Tellingly, even after a third government bailout agreement, reached on February 27, 2009, and with Citigroup's stock dipping to a record low closing price of $1.05 on March 9, 2009, Citigroup tried to continue its pretense of liquidity strength.  According to the *Wall Street Journal* on March 10, 2009: "Citigroup says it has a strong liquidity position and that its capital levels are among the highest in the banking industry." *U.S. Weighs Further Steps for Citi*, Wall Street Journal, Mar. 10, 2009. As one commentator observed: "***Citi has over $500 billion . . . of foreign deposits.  A***

*meaningful run would swamp its capital and available liquidity*." Naked Capitalism, March 10, 2009.

76.     The risks associated with Citigroup's liquidity crisis had been revealed, and Plaintiff understandably acted to mitigate the damages that Defendants' misrepresentations and material omissions had caused. On March 11, 2009, Plaintiff sold his holdings, losing 87% of his investment.

### Plaintiff's Purchases of Citigroup Shares

77.     Plaintiff purchased 10,000 shares of Citigroup common stock on September 30, 2008 at $21.02 per share, for an aggregate price of $210,239.

78.     Plaintiff purchased an additional 30,000 shares of Citigroup common stock on November 12, 2008, at $9.88 per share, for an aggregate price of $299,421.

79.     At the time of Plaintiff's purchases, the market price for Citigroup's common shares was artificially and fraudulently inflated due to Citigroup's actions and fraud on the market, as described above.

80.     Plaintiff sold all 40,000 shares of his Citigroup stock in two transactions on March 11, 2009, receiving aggregate consideration of $62,755, or under $1.57 per share.

81.     Plaintiff's total losses on his Citigroup stock were thus $446,925, or more than 87% of his investment, in less than six months.

82.     Plaintiff was damaged as a result of Defendants' untrue statements and omissions as set forth herein.  During the relevant time period, Citigroup issued a series of misrepresentations concerning its financial health and failed to provide true, accurate, and material information concerning the grave state of the company's balance sheet. As a result of these misrepresentations and omissions, the price of Citigroup's shares was

artificially inflated during the period from September 30, 2008, through November 12, 2008.

83.     Plaintiff, in reliance on Citigroup's false statements and omissions and on the integrity of the market for the shares, purchased Citigroup shares at artificially inflated prices.  The subsequent decline in the price for Citigroup shares was directly related to the disclosures made by Citigroup after Plaintiff's purchases.

84.     At the same time that Citigroup was defrauding the marketplace as described herein, it was engaging in a pattern of misconduct specifically directed at Plaintiff.  Over Mr. Solow's objection, in October 2008, Citigroup's subsidiary, Citibank N.A., wrongfully liquidated a $460 million portfolio of municipal bonds that Mr. Solow had pledged to Citibank as collateral for a loan.  Citibank sold these bonds *to itself*, at artificially depressed prices chosen by Citibank itself, and then re-sold the bonds for significant profits and other financial benefits.   That dispute is the subject of an ongoing litigation in New York Supreme Court and the New York Appellate Division.   In that litigation, the New York Supreme Court found that Citibank had improperly delayed in turning over a 54-page document that belatedly revealed Citibank's actual profits from the subject liquidation.[2]

## COUNT ONE

For Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder (Against Both Defendants)

85.     Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.

---

[2]    *See Citibank, N.A. v. Solow*, No. 603607-2008 (Sup. Ct. N.Y. Cty. June 25, 2010).

86.     Defendants used the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges to make materially false and misleading statements and omissions of material fact to (i) deceive the investing public, including Plaintiff, as alleged herein, (ii) artificially inflate and maintain the market price of Citigroup common stock, and (iii) cause Plaintiff to purchase Citigroup common stock at artificially inflated prices that did not reflect their true value.

87.     As the truth of Citigroup's "deal" with Wachovia reached the public, along with its falsely-represented base of domestic deposits, its false assertions regarding its capital strength and liquidity, and its off-balance sheet manipulations, the trading price of Citigroup common stock fell precipitously in late 2008 and early 2009.  In furtherance of their unlawful scheme, plan and course of conduct, Defendants took actions set forth herein.

88.     Defendants, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make the statement made not misleading, and/or substantially participated in the creation of the alleged misrepresentations, which operated a fraud and deceit upon the purchasers of Citigroup common stock and which caused Citigroup common stock to trade at artificially high market prices through November 2008, in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

89.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available

to them.  Defendants' material misrepresentations and omissions were done knowingly, or recklessly, and for the purpose and effect of concealing the truth with respect to Citigroup's operations, business, performance and prospects from the investing public and supporting the artificially inflated price of its common stock.

90.     The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Citigroup's common stock up to and through the time of Plaintiff's purchases in November 2008.  Plaintiff purchased Citigroup's common stock at artificially high prices.  As the truth emerged, the price of Citigroup's common stock fell.

91.     Plaintiff was unaware of the falsity of the material misrepresentations and omissions alleged herein, and believed, them to be true.  Had Plaintiff known the truth with respect to the business, operations, performance and prospects of Citigroup, which was concealed by Defendants, Plaintiff would not have purchased Citigroup's common stock, or if he had purchased such securities, would not have done so at the artificially inflated prices that he paid. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of Citigroup's wrongful conduct, Plaintiff suffered damages in connection with his transactions in Citigroup's stock in an amount to be determined at trial but which Plaintiff believes to be $446,925, or more than 97% of his investment, in less than six months.

## COUNT TWO

For Violation of Section 20(a) of the Exchange Act
(Against Defendant Pandit)

92.     Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.

93.     As alleged above, Citigroup violated Section 10(b) and Rule 10b-5 promulgated thereunder, and Plaintiff sustained damages as a direct and proximate result of those violations.

94.     Pandit acted as a controlling person of Citigroup within the meaning of Section 20(a) of the Exchange Act by reason of his position as a senior executive officer of Citigroup, his ability to approve the content and issuance of Citigroup's public statements, and his control over Citigroup's day-to-day operations. Pandit had the power and authority to direct and control, and did direct and control, directly or indirectly, the decision-making of Citigroup as set forth herein. Pandit had direct and supervisory involvement in the day-to-day operations of Citigroup and, therefore, is presumed to have had the power to control or influence the conduct giving rise to the violations of the federal securities laws alleged herein, and exercised the same.

95.     Pandit prepared, signed, and/or approved Citigroup's press releases and SEC filings that contained material false and misleading statements or omitted material facts. He was provided with or had access to copies of those statements prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

96.     On information and belief, Pandit acted with *scienter*, and knew or recklessly disregarded the fact that the representations made by him and Citigroup were materially false and/or omitted material facts.

97.     As alleged herein, Pandit culpably participated in Citigroup's violations of Section 10(b) of the Exchange Act. In addition, based on public filings with the Securities and Exchange Commission, including a Proxy Statement dated March 18, 2008, Pandit

personally owned 1,094,948 shares of Citigroup stock as of that date and, on information and belief, Pandit continued to have stock holdings of this magnitude through the time period of Plaintiff's purchases.  Pandit therefore had personal motivations (including but not limited to his personal stock holdings) for concealing the full extent of Citigroup's financial problems during the time

98.     By virtue of his position as a controlling person, Pandit is jointly and severally liable to Plaintiff pursuant to Section 20(a) of The Exchange Act for Citigroup's violations of Section 10(b).

## COUNT THREE

### Common Law Fraud Under New York Law
### (Against Both Defendants)

99.     Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.

100.    As alleged herein, each of the Defendants made material misrepresentations and omitted to disclose material facts about Citigroup and its financial condition.

101.    These misrepresentations and omissions were made intentionally, or at a minimum, recklessly, to induce reliance thereon by Plaintiff and the investing public when making investing decisions.

102.    The misrepresentations and omissions constitute fraud and deceit under New York law.

103.    Plaintiff reasonably relied upon the representations when making decisions to purchase Citigroup's shares and when otherwise making investment decisions with regard to Citigroup's shares, and did not know of any of the misrepresentations or omissions.

104.   As a direct and proximate result of the fraud and deceit by Defendants, Plaintiff suffered damages in connection with its investment in Citigroup's shares.

105.   Defendants' wrongful conduct, as described above and below, was malicious, reckless and willful, and directed at the public generally, not just Plaintiff alone.   Accordingly, punitive damages, in addition to compensatory damages, are appropriate to deter fraudulent conduct of this kind.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.   Awarding compensatory damages in favor of Plaintiff and against both Defendants for all losses and damages suffered as a result of Defendants' wrongdoing alleged herein, and for all damages sustained as a result of wrongdoing by persons controlled by Defendants and/or for whose conduct Defendants are responsible pursuant to principles of *respondeat superior*, in an amount to be determined at trial, together with interest thereon;

B.   Punitive damages based upon Defendants' net worth, in order to deter misconduct of this kind;

C.   Awarding Plaintiff his fees and expenses incurred in this action, including attorneys' fees and expert fees;

D.   Awarding Plaintiff prejudgment interest and/or consequential damages; and

E.    Granting such other and further relief as the Court may deem just

and proper.

Dated: New York, New York
        December 12, 2011

Respectfully submitted,

LOWENSTEIN SANDLER PC
*Attorneys for Plaintiff Sheldon H. Solow*

By: _____

Ira Lee Sorkin, Esq.
Jeffrey J. Wild, Esq.
Amiad M. Kushner, Esq.
Daniel K. Roque, Esq.
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
T: 212.262.6700
F: 212.262.7402

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHELDON H. SOLOW,

Plaintiff,

-against-

CITIGROUP, INC.  and VIKRAM PANDIT,
Defendants.

10 cv 02927 (RWS)

**AFFIDAVIT OF SERVICE**

State of New York  )
                   )   ss:
County of New York )

KATRINA JORDAN, being duly sworn, deposes and says:

1. I am an employee of the law firm Lowenstein Sandler PC. I am not a party to the action, I am over 18 years of age and reside in Millington, New Jersey.

2. That on the 12th day of December 2011, deponent served the within **Second Amended Complaint** by depositing a true copy of same, by FedEx, priority overnight mail, addressed as follows:

> Marc Alan Weinstein
> Jesse Lee Jensen
> Hughes Hubbard & Reed LLP
> One Battery Park Plaza
> New York, NY 10004

*Katrina Anne Jordan*
Katrina Jordan

Sworn to before me on this
12th day of December 2011

*Louis P. Bonilla*
Notary Public

LOUIS P. BONILLA
Notary Public, State of New York
No. 01BO4915236
Qualified in Bronx County
Certificate Filed in New York County
Commission Expires Dec. 31, 20___

25175/2
12/12/2011 16838083.2

# EXHIBIT
# A



FEDERAL RESERVE BANK OF NEW YORK

NEW YORK, N.Y. 10045-0001

AREA CODE 212-720-5000

January 14, 2009

**BY HAND**

Board of Directors
Citigroup Inc.
  c/o Vikram Pandit, CEO
399 Park Avenue
3rd Floor
New York, NY 10043

Dear Board Members:

Enclosed is our annual report of inspection for Citigroup Inc., as of December 31, 2008.  We assign ratings of 444/4[1] to Citigroup, and consider the firm to be in "marginal" condition[2]. Without prompt action, the organization's future viability could be impaired.

The financial condition of the firm has deteriorated.  We are lowering our assessment of the firm's financial condition to "marginal" from "fair." Losses for five consecutive quarters weakened the firm's capital base. Earnings and liquidity are "unsatisfactory" and asset quality is "fair." The capital subcomponent remains unchanged at "fair" balancing various considerations.

Serious deficiencies in Board & Senior Management oversight relating to the strategic direction of the firm, serious weaknesses in liquidity risk management, and material weaknesses in the firm's ability and its systems to monitor key vulnerabilities lead us to lower our assessment of Risk Management to "marginal."

We are also lowering the "Impact" rating of the firm from "limited" to "considerable" to reflect the weakened financial condition of the parent and non-bank subsidiaries, which significantly increases the likelihood that the firm may be unable to serve as a source of strength to its subsidiary banks.

Details of these findings are contained in the enclosed report and will be discussed with you during our scheduled meeting of January 21, 2009. Because of the nature and seriousness of the overall weaknesses, it is our intention to intensify our direct communication with the full board of directors,

---

[1]   The components of the RFI/C rating system are risk management, financial condition, likelihood of a negative impact of the parent and non-bank subsidiaries on the depository institutions, an overall composite, and a depository institution rating. All components use a scale of 1 to 5, ranging from strong to unsatisfactory.

[2]   Institutions so rated have significant risk management and financial weaknesses which may pose a heightened risk of significant negative impact on the subsidiary depository institutions.  Companies so rated require close supervisory attention and substantially increased financial surveillance.

**FEDERAL RESERVE BANK OF NEW YORK**    2

January 14, 2009

as well as engage in regular dialogue with the chairs of the Audit and Risk Management, Nomination and Governance, and Personnel and Compensation Committees to insure that remedial action is overseen at the highest levels. We are also requiring that senior management revise its corrective action plan pertaining to the Memorandum of Understanding of June 3, 2008 so that the concerns expressed in this letter are fully addressed to our satisfaction.

After you have had an opportunity to review this report, and within 30 days of the receipt of this letter, we would appreciate receiving management's written response to the matters discussed herein.   Please note that this letter and enclosures contain confidential bank examination material and should be treated accordingly by your organization as described in the footnote.[3]

Respectfully,

John J. Ruocco
Asst. Vice President



Enclosure

---

[3]  **THIS DOCUMENT IS STRICTLY CONFIDENTIAL:** This document has been prepared by an examiner selected or approved by the Board of Governors of the Federal Reserve System. The document is the property of the Board of Governors and is furnished to directors and management for their confidential use. The document is strictly privileged and confidential under applicable law, and the Board of Governors has forbidden its disclosure in any manner without its permission, except in limited circumstances specified in the law (12 U.S.C. 1817(a) and 1831m) and in the regulations of the Board of Governors (12 C.F.R. 261.20).

Under no circumstances should the directors, officers, employees, trustees or independent auditors disclose or make public this document or any portion thereof except in accordance with applicable law and the regulations of the Board of Governors. Any unauthorized disclosure of the document may subject the person or persons disclosing or receiving such information to the penalties of Section 641 of the U.S. Criminal Code (18 U.S.C. 641).

**RESTRICTED FR**



# SUMMARY OF SUPERVISORY ACTIVITY
# AND FINDINGS

Name:    CITIGROUP INC.            Period Covered:    January 1, 2008 – December 31, 2008

Location:    NEW YORK, NEW YORK        RSSD ID Number:    1951350

### THIS DOCUMENT IS STRICTLY CONFIDENTIAL

This summary has been prepared by an examiner selected or appointed by the Board of Governors of the Federal Reserve System. The summary is the property of the Board of Governors and is furnished to directors and management for their confidential use. The summary is strictly privileged and confidential under applicable law, and the Board of Governors has forbidden its disclosure in any manner without its permission, except in limited circumstances specified in the law (12 U.S.C. 1817(a) and 1831m) and in the regulations of the Board of Governors (12 C.F.R. 261.11). Under no circumstances should the directors, officers, employees, trustees or independent auditors disclose or make public this summary or any portion thereof except in accordance with applicable law and the regulations of the Board of Governors. Any unauthorized disclosure of the summary may subject the person or persons disclosing or receiving such information to the penalties of Section 641 of the U.S. Criminal Code (18 U.S.C. 641). Each director or trustee, in keeping with his or her responsibilities, should become fully informed regarding the contents of this summary. In making this review, it should be noted that this summary is not an audit, and should not be considered as such.

### FEDERAL RESERVE BANK OF NEW YORK

1

### *OVERALL COMPOSITE RATING*

In light of significant weaknesses in Citigroup's overall condition, we are downgrading its supervisory composite rating from "fair" to "marginal".[1] Our assessment is heavily influenced by the continued deterioration of Citigroup's financial condition, deficient oversight practices by the board of directors ("board") and senior management, and weaknesses in risk management. The financial and risk management weaknesses identified in this report, particularly those related to funding and liquidity risk management, left the firm seriously vulnerable given the recent stresses and market dislocations. Consequently, the firm needed extraordinary and unprecedented U.S. Government assistance in 2008. Further, those weaknesses have had a considerable negative impact on non-bank affiliates and the parent company's ability to serve as a source of strength to its subsidiary depository banks, as reflected in a downgrade of the "Impact" component rating to "considerable" probability of negative impact.

#### *Matters Requiring Immediate Attention*

The key concerns listed below warrant immediate attention by the board and senior management:

- The strategic direction and execution exhibited by the board and senior management have not been consistent with the vulnerabilities of the firm. The strategic plan must be reworked by the board and senior management to better reflect the firm's current financial resources and global economic realities, as well as address the span of control needed to continue to operate a large set of businesses across a significant number of countries.

- The firm remains in a much weakened state and is facing substantial headwinds from a weakening economy that could cause further credit deterioration and bring into question the adequacy of the firm's capital base going forward. Management's reformulated strategic plan must include actions to bolster the firm's common equity base. The firm's risk levels, as expressed by its own internal measures of risk such as economic capital and stress tests, substantially exceed common shareholder's equity. We caution that efforts to turn a profit for the firm in the near term must not result in outsized risk taking or diminution of the control infrastructure which could further undermine Citigroup's long-term performance.

- Liquidity vulnerabilities must be addressed. The liquidity contingency planning process was insufficient and hampered by structural impediments management had created through the pursuit of other objectives. Management's ability to identify

---

[1] Bank holding companies rated "marginal" have significant risk management and financial weaknesses, which may pose a heightened risk of significant negative impact on the subsidiary depository institution(s). Unless prompt action is taken to correct these conditions, the organization's future viability could be impaired. Firms rated as such require close supervisory attention and substantially increased financial surveillance.

2

shorter-term funding pressures in a timely manner has been substantially hindered by ineffective management information systems and data management practices. We understand that this is in part a function of the data available through legacy systems, with communication channels relied upon within Treasury to help fill gaps in quantitative information. Given the size and complexity of the firm's liquidity and funding demands, these deficiencies need to be addressed comprehensively and immediately.

These weaknesses require the development of immediate action plans and necessitate a more frequent dialogue between us and the full board and senior management of Citigroup. Additionally, we also plan to meet with the chairs of the Audit and Risk Management Committee, the Nomination and Governance Committee; and the Personnel and Compensation Committee on at least a quarterly basis to discuss their plans, or more frequently if circumstances warrant.

## FINANCIAL CONDITION

### *Overall: Marginal*

Citigroup's overall financial condition rating has been downgraded to "marginal" from "fair." The downgrade reflects significant deterioration in asset quality, earnings and liquidity, as well as our continued concern with the adequacy of Citigroup's capital base. Accordingly, heightened supervisory monitoring of the firm's financial condition will occur throughout 2009.

| Financial Condition Ratings for Citigroup | 12/31/08 |
|---|---|
| Overall Financial Condition Rating | 4 |
| *Subcomponent Ratings:* | |
| Capital Adequacy | 3 |
| Asset Quality | 3 |
| Earnings | 5 |
| Liquidity | 5 |

3

### Capital: Fair

The capital rating remains unchanged at "fair" --- balancing various considerations.

On the positive side, Citigroup's regulatory capital ratios are currently appreciably above "well-capitalized" levels and appreciably higher than they were last year. The high ratios are of course a result of injections of $45 billion in preferred equity by the U.S. Government, representing extraordinary and unprecedented action by the U.S. Government to address the weakened state of Citigroup.

On the negative side, this superficially well-capitalized position masks a series of underlying weaknesses. First, Citigroup does not have the prospect of augmenting its capital base over the short-to-intermediate run through earnings retention. The firm generated losses throughout the past four quarters, and is expected to continue to have negative earnings into 2009.

Second, the firm does not have ready access to private equity capital markets at this time. We do note that during the evaluation period senior management did raise capital in response to weaknesses in Citigroup's balance sheet. The need to enhance significantly the firm's capital base was a subject of our supervisory dialogue with senior management during the course of 2008. A total of $32.3 billion was raised through private and public issuance, of which $4.9 billion was common stock and the balance in non-cumulative perpetual preferred stock, addressing in part the concerns we had expressed. The effect of this capital raise on shareholders' equity, however, was offset by losses incurred.

Third, the firm is likely to experience substantial credit deterioration, which brings into question the adequacy of the firm's capital base going forward. The firm's risk levels are high when comparing risk as expressed by the firm's economic capital models in relation to regulatory capital. This indicates the firm has a material chance of falling below the well-capitalized threshold, or wiping out the common shareholders.

Finally, Citigroup's capital base is heavily skewed towards preferred and hybrid equity, reflecting the replacement of lost common equity with U.S. Government preferred. Expressed another way, the firm's tangible common equity has declined over the last several quarters and is now very low relative to either total tangible assets or risk weighted assets. This shift in the composition of capital is concerning as it limits the discipline common shareholders can exert on the firm's risk taking.

In light of the above considerations, and notwithstanding the current high regulatory capital ratios, we re-emphasize the need for the board and senior management to outline ways of improving upon the firm's equity base over time.

4

### Asset Quality: Fair

Citigroup's asset quality is downgraded to "fair" from "satisfactory," reflecting weaknesses in the consumer and, to a lesser degree, the wholesale portfolios. Deterioration in the firm's consumer portfolio continues to be driven by worsening trends within the U.S. mortgage portfolio. More recently, deterioration in the domestic credit card, auto and personal installment portfolios has become more pronounced. Similar trends are observed in the performance of the firm's international retail portfolio. We recognize the associated build in the allowance for loan losses in response to the noted deterioration. We also recognize more broadly steps taken to mitigate delinquencies and losses, for example, by moving away from third party origination sources for the home equity and first mortgage portfolios. While the level of non-performing loans and credit losses in the wholesale accrual book remains modest, the upward trend in criticized exposures is a growing concern given the current environment.

### Earnings: Unsatisfactory

Citigroup's earnings performance has been downgraded to "unsatisfactory" from "marginal." The downgrade is driven by a prolonged period of poor performance, posing a significant threat to the firm's capital base and ultimately, its solvency. Losses for 2008 total more than $19 billion. Core revenues remain weak across major business lines, such as Global Cards, Consumer Banking, and Securities and Banking. Additionally, those business lines, which had served as a source of positive earnings, such as Global Wealth Management and non-US operations, are under strain. International consumer businesses are expected to deteriorate at a rate closer to that already experienced on comparable U.S. assets. Furthermore, growth in the Global Transaction Services business line, historically a strong performer, is also showing signs of strain and with performance expected to moderate in 2009.

In the coming year, senior management is projecting higher credit costs as demonstrated in its current "2009 Downside" scenario, which forecasts a net loss of $5.7 billion, including estimated provisions of $38.5 billion and $6.4 billion of further write-downs in legacy portfolios. To help offset declining revenues, Citigroup has a significant reengineering initiative underway including a total workforce reduction of up to 35,000 by 2Q09; however, these efforts are insufficient in and of themselves to restore the firm to profitability.

5

*Liquidity: Unsatisfactory*

Citigroup's liquidity has been downgraded to "unsatisfactory" from "fair" as the funding position of the firm remains at risk and immediate steps are needed to address liquidity vulnerabilities.  In our Summary of Supervisory Activity and Findings delivered this past April, we concluded that the funding position of the firm was at risk and steps were needed to improve liquidity.  We are not satisfied that enough has been done to address those concerns.

Over the course of 2008, a priority of the Federal Reserve supervisory team has been engaging Citigroup management regarding our concerns with the firm's funding and liquidity vulnerabilities.  Those vulnerabilities became significantly more pronounced in times of stress as exhibited through weaknesses in the firm's contingency funding process in part due to structural impediments to building contingent liquidity sources and the absence of quantitative data that adequately highlighted the firm's short term funding vulnerabilities.

The contingency funding process performed poorly as senior management ran out of options for supplementing the needs of its broker-dealer subsidiaries, and was slow in taking action to build contingent capacity for the lead U.S. bank.  For example, it was only in response to an impending downgrade by the rating agencies that a limited amount of assets were moved to Citibank N.A. for pledging to the Discount Window.  A substantial lead time was needed to consider repositioning other assets which could not be done given the immediacy of the potential risk event.  In our view, proactive steps were not taken to address the contingent funding needs of the banks as this vulnerability was well understood by management.

Addressing the liquidity needs of the consolidated firm and of its major individual subsidiaries has been excessively complicated by legal and structural impediments created through the pursuit of other objectives.  For example, in establishing the structure of the firm's legal vehicle entities, management focused on minimizing tax implications without appropriate consideration as to how the resulting structure would hamper access to contingent liquidity.

Senior management has been over-reliant on longer-term liquidity measures and on absolute levels of liquid assets, which do not provide a nuanced view of the firm's shorter-term liquidity vulnerabilities.  Management's ability to identify shorter-term liquidity vulnerabilities on a timely basis, particularly during times of stress, has been substantially hindered by ineffective management information systems and data management practices which makes liquidity monitoring and reporting manually-intensive, overly anecdotal and prone to error.  For example, management was slow to initiate more-timely and granular deposit monitoring as formal daily deposit monitoring by region only began at the end of September 2008, with daily deposit monitoring by country having been initiated this past December.  In addition, the monitoring and reporting of significant funding concentrations is not timely (currently done quarterly) and does not provide sufficient insights into concentrations by country and counterparty.

6

In addition, secured funding data by counterparty and collateral type are not readily available on a legal entity basis for the firm's U.S., U.K. and Japanese broker-dealers.

Citigroup is more dependent on 'non-core' funding sources (i.e., wholesale funding sources such as securities repurchases, commercial paper, capital markets issuances, and foreign deposits) to fund long-term assets than its peers. Citigroup's net non-core funding dependence ratio (defined as net non-core funding sources to long term assets) is 105% with peer institutions at 56% percent. In addition, domestic deposit funding is significantly below peers as domestic deposits represent only 14% of Citigroup's total assets whereas peers is 41%. This is a significant vulnerability as foreign-based deposits displayed a high level of outflow during the firm's recent stress period and the firm is reliant on foreign deposits to fund a substantial portion of its U.S. dollar-denominated domestic assets. Deposit outflows of approximately $25 billion in late November and early December 2008 posed a significant risk to the firm.

Under a plausible deposit runoff scenario the lead bank would exhaust its cash resources in only a few days. These trends do not show up in the structural liquidity measures management has relied upon most heavily in describing the firm's funding position with us. Further, the firm does not sufficiently monitor funding vulnerabilities by legal vehicle, relying instead on separate views of the composite banks and composite broker-dealers. This contributed to management's inability to quantify the degree of funding stress the individual broker-dealers would be subject to should access to secured financing markets diminish further. This weakness was exacerbated by the fact that the broker-dealers are heavily dependent on the financing of illiquid securities on an overnight basis.

## RISK MANAGEMENT

The Risk Management rating represents an evaluation of the ability of Citigroup's board and senior management, as appropriate for their respective positions, to identify, measure, monitor, and control risk across the bank holding company and its subsidiaries. The rating is supported by four subcomponents: Board and Senior Management Oversight; Policies, Procedures and Limits; Risk Monitoring and Management Information Systems ("MIS"); and Internal Controls.

7

| Risk Management Ratings for Citigroup | 12/31/08 |
|---|---|
| Overall Risk Management Rating | 4 |
| *Subcomponent Ratings:*<br><br>Board and Senior Management Oversight<br>Policies, Procedures, and Limits<br>Risk Monitoring and MIS<br>Internal Controls | <br><br>4<br>3<br>4<br>3 |

## *Summary of Risk Management Conclusions*

The assessment of Citigroup's overall risk management is downgraded to "marginal"[2] from "fair," with similar assessments assigned to the "Board and Senior Management Oversight" and "Risk Monitoring and MIS" elements.  The remaining sub-components, "Policies, Procedures and Limits" and "Internal Controls" remain rated at "fair."  We do acknowledge efforts by the board and senior management in several areas to improve the management of risk, including initiatives undertaken to address our supervisory concerns outlined in the Summary of Supervisory Activity and Findings of April 2008. Most notable have been steps taken to implement uniform approaches across businesses in measuring risk, and to instill greater discipline on balance sheet usage. However, from an overall supervisory perspective, these actions are outweighed by the negative consequences of the deficiencies noted throughout this report.

## *Discussion of Risk Management Subcomponents*

### ——*Board and Senior Management Oversight:   Marginal*

Board and Senior Management Oversight has been downgraded to "marginal" from "fair" based on shortfalls in the design and execution of appropriate strategies that are commensurate with the firm's financial condition, particularly its funding position, and liquidity risk management process. There is a need for the highest level of engagement by the board and senior management to ensure that weaknesses within the firm are addressed immediately.  The board must set a strategic direction for the firm that reflects current realities and prepares the firm for weathering further deterioration.  The strategic plan

---

[2] A risk management rating of "marginal" represents deficient risk-management practices that fail to identify, monitor, and control significant risk exposures in many material respects; one or more of the four elements of sound risk management are deficient and requires immediate and concerted corrective action by the board and senior management.

CONFIDENTIAL
FCIC-Citi-000266

8

must be sized appropriately to the firm's available financial resources and consistent with the current global economic realities.

We do recognize the concerted efforts of the board and senior management to attract new talent to bolster the strength of Citigroup's senior leadership committee. We also recognize the extent of recent efforts by the board to engage strongly with senior management and the supervisors on financial and risk management concerns. Management also has employed strategies to offset the firm's financial deterioration, including asset divestitures, cost reductions, and scaling back of certain exposures though they have proven to be insufficient in the current environment.

Deficiencies were also observed in senior management performance, as it did not proactively address significant liquidity risks of the firm. These shortfalls were exacerbated by prior excessive risk taking at the firm that put downward pressure on earnings and capital, coupled with significant funding vulnerabilities.

With respect to funding and liquidity risk, management has over-relied on longer-term and aggregate funding metrics that do not provide a nuanced view of immediate vulnerabilities. Among other concerns is the firm's high degree of reliance on non-core funding sources. The board of directors and senior management must resolve the firm's structural funding vulnerabilities, as they pose significant risk to the safety and soundness of the organization. We require the board of directors and senior management to submit an action plan that identifies corrective actions as well as the time frame in which these actions will be taken.

## ——*Policies, Procedures, and Limits:  Fair*

The rating of Policies, Procedures, and Limits remains "fair," recognizing that some steps have been taken to respond to the risk management deficiencies identified in the Summary of Supervisory Activity and Findings of April 2008. However, greater attention is needed in the liquidity risk management program. We also note that management continues to further refine and rationalize the credit limit structure, and develop and implement supporting policies and procedures. Within liquidity risk management, an urgent need remains to improve communication and coordination across individual country treasury functions, as well as to align treasury reporting and ALCO processes across regional treasuries.

Updates to corporate level policies and procedures also remain a work in progress. For example, we understand that management is on track to roll-out new market risk limits with corresponding policies and procedures by the second quarter of 2009 to provide consolidated monitoring of the more than 2,000 limits currently in place. Refinements are also needed to the firm's economic capital methodology as identified by management. Tools to be used for measuring risk-adjusted returns of businesses are also still in development.  Further progress on all of these fronts is needed.

CONFIDENTIAL
FCIC-Citi-000267

9

Finally, we note weaknesses in regulatory reporting practices, including data quality and documentation exception issues, stemming from failures to adhere to defined policies and procedures. We have detailed our concerns with regulatory reporting practices to management during the fourth quarter of 2008 and will relay them in a separate examination letter within the next few days.

*—Risk Monitoring and MIS:   Marginal*

Risk Monitoring and MIS is downgraded to "marginal," reflecting serious weaknesses in management's ability to effectively and proactively monitor key vulnerabilities. From a liquidity standpoint, the firm has been unable to sufficiently monitor funding vulnerabilities on a legal vehicle basis, relying instead on composite views of banks and broker-dealers. As noted above, senior management's over-reliance on longer-term structural liquidity measures does not provide a nuanced interpretation of shorter-term vulnerabilities, highlighting a critical deficiency for the firm.

Due to systems limitations, the firm relies heavily upon manual intervention to aggregate risk data more broadly, particularly across key legal entities. This reliance has severely constrained management's ability to identify key funding and liquidity vulnerabilities on a timely basis. The dependence upon manual adjustments is also directly observable in the aggregation of key risk positions, hampering the firm's ability to generate exposure reports in line with peer.

*——Internal Controls:  Fair*

Internal Controls at Citigroup remain "fair," reflecting a high degree of vulnerability due to a significant level of manual intervention required to capture key risk attributes, verify exposures and ensure data integrity. Reliance on manual processes that put additional pressures on controls is of particular concern given the significant increases in transaction volumes during recent market dislocations. We recognize management's commitment to ensuring that ongoing cost control initiatives do not postpone or defer needed improvements to systems, processes or controls. We also note that Audit and Risk Review continues to fulfill its mandate in a satisfactory manner, and that controls have been tightened around budget planning, balance sheet management, and counterparty risk management.

**Other Supervisory Matters**

Status of Enforcement Action: Memorandum of Understanding

The Memorandum of Understanding ("MOU") entered into by Citigroup and the Federal Reserve Bank of New York on June 3, 2008 requires senior management to assess, address, and resolve deficiencies in the firm's risk management processes broadly defined. On August 11, 2008, senior management submitted a corrective action plan in

CONFIDENTIAL
FCIC-Citi-000268

10

response to the MOU with most steps slated for completion by end year-end 2008 and the remainder by May 2009. Events since the plan was prepared clearly necessitate the need for management to revisit the actions needed to strengthen the firm.

## IMPACT RATING

The likelihood of significant negative impact on subsidiary banks from the parent company and non-bank subsidiaries has increased to "considerable" from an assessment of 'limited" at the previous year's inspection. This revised assessment reflects a weakened financial condition on the part of the parent company, which significantly hinders its ability to act as a source of financial strength to its bank subsidiaries. Operating losses at the non-bank subsidiaries (predominately the broker-dealers and CitiFinancial) have significantly constrained their ability to upstream dividend income to the parent company in support of the bank holding company's debt service requirements, or the needs of depository institutions. To this point, dividend income has shrunk to approximately $1.6 billion (September 2008 year-to-date) from more than $10 billion in 2007.

Furthermore, operating revenue at the parent company is insufficient to cover debt service requirements with cash flows from operations covering only 43% of debt service requirements as of September 30, 2008 (versus 96% a year prior) compared to 116% coverage for peer institutions. This situation is further compounded by a higher double leverage ratio, 123%, relative to peers. This means that the parent has issued a substantial amount of debt with the proceeds having been injected as capital to subsidiary banks allowing them to further lever. It is expected that capacity to upstream dividend income from non-bank subsidiaries in 2009 will continue to be limited in light of weak earnings prospects. This suggests further challenges in generating dividend income to bolster operating cash flow at the parent company.

## DEPOSITORY INSTITUTIONS' RATING

A discussion of the depository institutions' rating will be forthcoming.

## CAMEO: Rating of the Edge Act Corporation

The overall condition of Citibank Overseas Investment Corporation ("COIC") has been downgraded to "fair" from "satisfactory," reflecting similar assessments of capital, asset quality, and earnings. Management remains rated "fair." The rating for Operational Controls has been downgraded to "fair" from "satisfactory" to reflect the firm-wide weaknesses that have been identified in Internal Controls, Risk Monitoring and MIS, and Policies, Procedures and Limits.

CONFIDENTIAL
FCIC-Citi-000269

11

| CAMEO RATING | 12/31/2008 |
|---|---|
| Overall CAMEO Ratings | 3 |
| *Subcomponent Ratings:*<br>Capital<br>Asset Quality<br>Management<br>Earnings<br>Operational Controls | <br>2<br>2<br>3<br>2<br>3 |

**Capital** remains "satisfactory" in spite of capital ratios normally associated with stronger capital positions and due to the parent's constrained capital position and the likely effects of COIC's declining profitability and asset quality on capital going forward.

**Asset Quality** remains "satisfactory," outperforming the parent's thus far. On a risk weighted basis, classified assets represent only 1.9% of Tier 1 capital and unimpaired surplus, much less than the bank and the consolidated holding company. Loans account for 40% of assets with the remainder in lower risk and inter-company transfers, cash, and securities. Nevertheless, the rising delinquencies continue to spread to new geographies. In 2008, total past due and nonaccruals rose and now constitute 3.4% of outstanding loans. Criticized assets grew 60% and total classified assets nearly tripled as the allowance for loan and lease losses ("ALLL") slightly outpaced charge-offs.

**Management** remains "fair," with COIC relying on the same leadership, risk management infrastructure and personnel as the parent bank and bank holding company.

**Earnings** remain "satisfactory," outperforming the parent's thus far. Although COIC's return-on-assets still slightly exceeds 1.0%, the firm's return-on-equity continues to fall below 11%, reflecting a less than strong earnings performance. Moreover, the effects of the current global economy have begun to impact the firm and can be seen in declining profit margins, high overhead costs, declining asset quality, rising ALLL provisions, and emerging earnings shortfalls in new geographies.

**Operational Controls** has been downgraded to "fair" as policies, procedures, risk monitoring, and MIS are the same as those employed at a firm-wide level and at the parent bank. Moreover, enhancements to information technology and to compliance practices specific to COIC appear to be warranted based on reviews performed by Internal Audit and foreign supervisors.

12

## *SUPERVISORY ACTIVITIES IN 2008*

The Federal Reserve's supervisory program is accomplished through a combination of continuous monitoring by a core team of resident examiners and a series of more formal targeted examinations. In addition to periodic meetings with management, the core team has access to a significant amount of internal financial and risk management information. Analysis of that information enables the team to keep abreast of changes in the firm's business strategy, management structure, and risk profile.

The review of internal risk management reports is a critical element of our supervisory process. Reliance is also placed on the supervisory work of the primary bank regulator, functional supervisors, and foreign regulators. Supervisory information received from those sources is factored into our annual assessment of Citigroup.  During the 2008 supervisory cycle, given the stressed financial markets and economic environment, a more significant emphasis was placed on heightened continuous monitoring activities.

### *Scope of Reviews*

### Liquidity Risk

- *Liquidity Risk Heightened Continuous Monitoring* The key focus was on the firm's funding position, metrics, MIS reporting and risk management.  Particularly, monitoring included reviews of Citigroup's liquidity portfolio levels, stress testing, debt maturity profile, investor and counterparty concentrations, deposit flows and business and geographic composition.  Additionally, intensive monitoring was undertaken of the firm's secured financing profile, including dependence on overnight financing of illiquid collateral, contingent borrowing/collateral capacity (FHLB and central bank) and the liquidity impact of potential rating agency downgrades and of off balance sheet exposures.

### Credit Risk

- *Commercial Real Estate (CRE)* The review assessed direct and indirect risk exposures and vulnerabilities in CRE portfolios firm-wide.  This included a review of the accrual book, with a focus on the degree of credit deterioration in the various sub-portfolios, as well as reserving and other risk management practices and processes. Examiners reviewed valuation practices and the application of "shadow" accrual book internal ratings assigned to the warehoused assets in the mark-to-market portfolios.

- *Counterparty Credit Risk Exposure Measurement and Management* This interagency horizontal review focused on the ability of firms' counterparty credit risk measurement and management processes needed to support trading of complex products with hedge funds that could result in large exposures.  The review concentrated on areas of potential slippage between the underlying inherent risks of positions and the processes that support the measurement and reporting of these exposures.

13

- *Credit Risk Heightened Continuous Monitoring* There were several highly focused credit risk monitoring efforts to determine exposures and risks associated with certain groups of counterparties and obligors, leveraged finance, CDOs, retail credit (including loss mitigation strategies and allowance for loan and lease losses) and wholesale credit risk (including the top single name counterparty credit risk concentrations). Additionally, credit valuation adjustments, unfunded credits lines and corporate refinancing requirements were also evaluated.

**Market Risk**

- *Market Risk Heightened Continuous Monitoring* Continuous market risk monitoring efforts focused on structured finance, commodities, auction rate securities, structured investment vehicles, stress testing, and covered bonds.

**Operational Risk**

- *Internal Audit Effectiveness* In a target examination, examiners evaluated the independence of internal audit, the role of the board level Audit and Risk Management Committee (ARMC), the adequacy of the audit methodology, plan and risk assessment, the quality of audit work and other audit ancillary processes.

- *Basel II AMA Implementation* Guided by the Final Rule and the inter-agency Operational Risk Work Program for Basel II AMA, examiners evaluated Citigroup's quantification models, operational risk data and assessment systems, risk management processes such as control, oversight and validation mechanisms, and the progress towards resolution of the issues identified during the 2007 examination.

**Legal and Compliance Risk**

- *Compliance Metrics Horizontal* The objectives of this review were to develop a better understanding of, and make assessments about, the state of compliance metrics more broadly, and to better understand the development and governance processes for compliance metrics and how they are used to aid in the monitoring of compliance risk.

- *CitiFinancial Puerto Rico (Phase I and II)* Examiners conducted multi phased reviews to assess risk management oversight and compliance controls for specific fair lending U.S. consumer protection laws applicable to the Puerto Rico operations of CitiFinancial.

- *Regulation K Discovery* The purpose of this review was to better understand the corporate arrangements and structures, expectations, and approval mechanisms that pertain to compliance with the Federal Reserve's Regulation K (International Banking Act). The focus of the review included internal reporting mechanisms,

14

information-sharing channels and the degree of communication and coordination among stakeholders responsible for governance.

**Other**

- *Regulatory Reporting* Examiners assessed the quality of banking regulatory reports and related control processes, tested the accuracy of a sampling of 2008 reports, and evaluated Citigroup's progress in addressing weaknesses from the prior review.

- *Banamex* Examiners assessed corporate governance and the internal control environment for credit risk management, information technology, payments and settlement systems, and anti-money laundering operations.

- *Basel II Draft Implementation Plan (DIP) Review* Examiners from the FRBNY and OCC, with participation from the FDIC, reviewed areas of Citigroup's Basel II DIP (version 3.0); the primary objective was to provide informal feedback on the completeness and comprehensiveness of the documentation supporting the DIP. While examiners did not provide a formal assessment at that time, as the plans were in draft form, the intention was to determine if management had identified all of the significant gaps between processes utilized by Citigroup and those that need to be in place in order to comply with the requirements of Basel II.