UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

SHELDON H. SOLOW,

                     Plaintiff,          10 Civ. 2927(RWS)

   -against-                          OPINION

CITIGROUP, INC. and VIKRAM PANDIT,

                    Defendants.

-------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiff

        LOWENSTEIN SANDLER PC
        1251 Avenue of the Americas
        New York, NY  10020
        By:  Amiad Moshe Kushner, Esq.
             Amit Sondhi, Esq.
             Ira Lee Sorkin, Esq.
             Donald Albert Corbett, Esq.
             Jeffrey J. Wild, Esq.


        Attorneys for Defendants

        HUGHES HUBBARD & REED LLP
        One Battery Park Plaza
        New York, NY  10004
        By:  Marc Alan Weinstein, Esq.
             Jesse Lee Jensen, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/18/12

**Sweet, D.J.**

Defendants Citigroup Inc. ("Citigroup") and Vikram Pandit ("Pandit," and, with Citigroup, the "Defendants") have moved pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) to dismiss the Second Amended Complaint (the "SAC") of plaintiff Sheldon H. Solow ("Solow" or the "Plaintiff"). Based upon the conclusions set forth below, the motion is granted and judgment will be entered dismissing the SAC with prejudice.

**Facts & Prior Proceedings**

The facts of the case, its prior proceedings and the allegations in Plaintiff's First Amended Complaint (the "FAC") are discussed in detail in the Court's opinion dated November 22, 2011 granting Defendants' motion to dismiss the FAC (the "November 22 Opinion"). See Solow v. Citigroup, Inc., No. 10 Civ. 2927(RWS), 2011 WL 5869599, at *1-4 (S.D.N.Y. Nov. 22, 2011). Familiarity with those facts, prior proceedings and allegations is assumed.

In the November 22 Opinion granting Defendants' motion to dismiss, Plaintiff was afforded leave to file an amended

1

complaint within twenty days.  On December 19, 2011, Plaintiff

filed the SAC.  The SAC, similar to the FAC, alleges that

Citigroup made various misrepresentations and omissions

concerning its level of capitalization and liquidity.  According

to the SAC, beginning in the fall of 2008, Citigroup knew, but

did not disclose, the material risk that it could fall below the

"well-capitalized" threshold because of continuing write downs

on tens of billions of dollars in toxic mortgage-related assets.

Furthermore, Citigroup knew, but did not disclose, that its

liquidity was eroding because, among other things, its foreign

depositors were withdrawing their deposits.  Citigroup also

failed to disclose the fact that it obtained hundreds of

billions of dollars of loans from the Federal Reserve that were

intended to assist financial institutions that lacked access to

liquidity.

        The SAC alleges that, rather than inform the market

and investors of these risks, Citigroup and Pandit, who serves

as Citigroup's Chief Executive Officer, assured investors that

Citigroup had strong liquidity, strong capital and ample

deposits.  Plaintiff alleges that investors, including Solow,

relied on Citigroup's misrepresentations and that Solow made

substantial purchases of Citigroup stock in late September and

2

early November of 2008.  Solow ultimately sold his shares in

March 2009 at a loss of 87%.  The SAC asserts three causes of

action: a claim against both Defendants under Section 10(b) of

the Securities Exchange Act of 1934 and Rule 10b-5, a claim

against Pandit under Section 20(a) of the Exchange Act for

control person liability and a claim against both Defendants for

common law fraud.


      The SAC includes new allegations that were not present

in the FAC including:


- A non-public January 2009 Federal Reserve report detailed
  Citigroup's capital and liquidity deficiencies and found,
  inter alia, that Citigroup "has a material chance of
  falling below the well-capitalized threshold."

- Allegations detailing how write downs on Citigroup's
  portfolio of toxic assets eroded Citigroup's "Tier 1"
  capital ratio.

- Allegations linking Citigroup's November 17, 2008
  announcement that it was reclassifying $80 billion in
  assets to the erosion of Citigroup's "Tier 1" capital
  ratio.

- Allegations linking Citigroup's November 19, 2008
  announcement that it was purchasing $17 billion in
  structured investment vehicle assets to the erosion of
  Citigroup's "Tier 1" capital ratio.

- New details concerning Citigroup's non-public requests for
  government assistance in November 2008 to address
  Citigroup's capital and liquidity deficiencies, including a
  request that the Federal Reserve permit Citigroup to post

toxic assets as collateral for borrowings from the Federal Reserve's emergency lending facilities and a request for favorable capital treatment for a $306 billion portfolio of Citigroup's troubled assets.

- The FDIC's estimate that the $306 billion in trouble assets subject to the government guarantee announced in November 2008 included $38 billion in "embedded credit losses," allegedly confirming that more write downs were coming. Citigroup was required to cover the first $39 billion in losses on this $306 billion portfolio, allegedly demonstrating that Citigroup's "Tier 1" capital ratio would continue to erode notwithstanding the government's assistance.

- Allegations detailing the $40 billion in capital benefits that the government provided to Citigroup in the November 2008 bailout, allegedly demonstrating Citigroup's need for capital.

- Citigroup's January 16, 2009 fourth quarter earnings report disclosing that Citigroup had lost foreign deposits in the fourth quarter of 2008, allegedly establishing Citigroup's lack of liquidity.

- The Federal Reserve's January 2009 report finding that "[d]eposit outflows of approximately $25 billion in late November and early December 2008 posed a significant risk to [Citigroup]" and rating Citigroup's liquidity as "unsatisfactory," the lowest possible rating.

- Details concerning how these revelations impacted Citigroup's stock price.

**The Applicable Standard**

As noted in the November 22 Opinion, on a motion to dismiss pursuant to Rule 12, all factual allegations in the complaint are accepted as true, and all inferences are drawn in

favor of the pleader.  Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).  The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 235-36, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937 173 L.Ed.2d 868 (2009) (quoting Bell Atl Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.  Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

**Defendants' Motion To Dismiss The Section 10(b) Claim Is Granted**

5

Count One of the SAC accuses both Defendants of violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As noted in the November 22 Opinion, to state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: (i) a misstatement or omission of material fact (ii) with scienter (iii) in connection with the purchase or sale of a security, (iv) upon which the plaintiff relied, and (v) that the misstatement or omission proximately caused economic loss.  See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir. 2007).  Failure to plead properly any one element necessitates dismissal of the claim.  See, e.g., Good Hill Partners L.P. v. WN Asset Holdings Corp. CI, 583 F. Supp. 2d 517, 520-21 (S.D.N.Y. 2008).

The November 22 Opinion dismissed the FAC's Section 10(b) claim.  Although the FAC had adequately pled misstatements or omissions with respect to Citigroup's representations regarding its liquidity[1] and the FAC pled scienter with respect to Defendants' statements about liquidity and capital,

---

[1]   The November 22 Opinion held that the FAC did not adequately plead misrepresentations or omissions concerning Citigroup's representations regarding its level of capitalization, its acquisition of Wachovia or its deposit base. See Solow, 2011 WL 5869599, at *6-7.

Plaintiff's Section 10(b) claim failed because the FAC failed to allege sufficient facts establishing the element of loss causation.  See Solow, 2011 WL 5869599, at *5-10.  Plaintiff claims that the amendments in the SAC establish both that Defendants made material misstatements or omissions with respect to Citigroup's capitalization and that the SAC alleges sufficient facts to plead loss causation.

### A. The SAC Fails To Allege Sufficient Facts Establishing Defendants To Have Made Material Misstatements Or Omissions Regarding Citigroup's Capitalization Levels

It is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5; see also In re Citigroup Inc. Sec. Litig., 753 F. Supp. 2d 206, 232 (S.D.N.Y. 2010).  A duty to disclose arises either "when disclosure is necessary to make prior statements not misleading," Beleson v. Schwartz, 599 F. Supp. 2d 519, 525 (S.D.N.Y. 2009), or "when silence would make other statements misleading or false."  In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008).  The SAC alleges that Citigroup's representations that it was "well in

7

excess of the 'well-capitalized' regulatory minimums," had "a

very strong Tier 1 ratio" and "maintained its 'well-capitalized'

status" were misleading because, contrary to Citigroup's

representations, Citigroup's capital position was deteriorating.

Although Citigroup's representations concerning its

capitalization levels were analyzed in the November 22 Opinion,

see Solow, 2011 WL 5869599, at *6-7, the SAC provides facts that

were not alleged in the FAC, including:


- The Federal Reserve concluded that Citigroup "has a
  material chance of falling below the well-capitalized
  threshold" even after the government provided Citigroup
  with $40 billion capital benefits.

- In the fall of 2008, Citigroup "held massive positions in
  'toxic' subprime assets on its balance sheet that were
  marked to market," but "did not disclose the specific toxic
  securities that it held or the extent to which it
  anticipated marking down their value."  According to one
  analyst, "the amount of toxic waste residing on Citigroup's
  balance sheet . . . is in the tens of billions and
  currently unknown."

- Write downs on toxic assets increased their "risk
  weighting" for regulatory capital purposes and reduced
  Citigroup's Tier 1 capital ratio.

- On or about November 22, 2008, Citigroup made a non-public
  request that the government provide a rescue package that
  included measures to increase Citigroup's capital levels,
  including "capital forbearance" on $306 billion of
  Citigroup's toxic assets and permitting "preferred
  instruments to count toward Tier 1 and other regulatory
  ratios."

- The FDIC provided a non-public estimation that the $306 billion portfolio of toxic assets for which Citigroup was seeking "capital forbearance" included "$38 billion in embedded credit losses," confirming that Citigroup planned, but did not disclose, further write downs that would cause further declines in Citigroup's Tier 1 capital ratio.

- In the fall of 2008, Citigroup requested expanded access to the Federal Reserve's emergency facilities, and the FDIC non-publicly noted that Citigroup requested the government accept collateral that was "of lower credit quality or weaker underwriting standards" and that the Federal Reserve would "not be willing to accept the collateral without a substantial haircut."

According to Plaintiff, these allegations plausibly demonstrate that Citigroup's claimed "well-capitalized" status was at risk due to its toxic assets and that Citigroup, recognizing its capital deficiency, requested government assistance to increase its capital.  Plaintiff contends that disclosing the risk that write downs on toxic assets could cause Citigroup to fall below the "well-capitalized" threshold was required to make Citigroup's statements concerning its "well-capitalized" status not misleading.

Notwithstanding Plaintiff's revised contentions, it must be noted that the SAC is devoid of allegations that Citigroup's Tier 1 capital ratio was anything other than what Citigroup represented it to be.  Banks are considered "well-capitalized" if, among other factors, they have a Tier 1 risk-

9

based capital ratio of 6.0 or greater.  See 12 C.F.R. § 325.103.
The SAC fails to allege that Citigroup ever fell beneath this
regulatory threshold such that Defendants' statements concerning
Citigroup's capitalization levels would be misleading.

Plaintiff attacks Defendants' contention that the SAC
cannot allege a misstatement with respect to Citigroup's
capitalization if Citigroup met the regulatory definition of
"well-capitalized," arguing that even though Citigroup's
statements that it met the "well-capitalized" threshold were
true, Citigroup had a duty to disclose information indicating a
significant risk that it would fall below that threshold.  In
support of his contention, Plaintiff cites this Court's opinion
in the E*Trade securities litigation, see Freudenberg v. E*Trade
Financial Corporation, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010)
("[S]tatements, although literally accurate, can become, through
their context and manner of presentation, devices which mislead
investors.  For that reason, the disclosure requirement by the
securities laws is measured not by literal truth, but by the
ability of the material to accurately inform rather than
mislead[.]"), and notes that Defendants' position regarding its
capitalization levels is contradicted by the Federal Reserve,
which concluded that Citigroup "ha[d] a material chance of

10

falling below the well-capitalized threshold."  However,
Citigroup was not obligated to characterize its performance or
future outlook in negative terms, speculate on future negative
results or paint themselves in the most unflattering light
possible.  See Harrison v. Rubenstein, No. 02 Civ. 9356(DAB),
2007 WL 582955, at *13 (S.D.N.Y. Feb. 26, 2007) (granting motion
to dismiss securities fraud claims, holding that defendant "was
[] under no duty to direct conclusory accusations at itself or
to characterize its behavior in a pejorative manner in its
public disclosures") (citation and quotation marks omitted); see
also Mo. Portland Cement Co. v. Cargill, Inc., 498 F.2d 851, 873
(2d Cir. 1974) ("Courts should tread lightly in imposing a duty
of self-flagellation").  Additionally, Plaintiff's citation to
the E*Trade case is unavailing because, as described below,
Citigroup disclosed its exposure to the mortgage-related toxic
assets Plaintiff claims had the potential to decrease
Citigroup's capitalization levels.  See E*Trade, 712 F. Supp. 2d
at 180 ("If a company, like E*TRADE here, puts the topic of the
cause of its financial success at issue, then it is obligated to
disclose information concerning the source of its success.")
(citations and quotation marks omitted).

11

In support of this argument that Defendants had a duty to disclose, Plaintiff draws an analogy to the case of In re General Electric Company Securities Litigation, No. 09 Civ. 1951(RJH), 2012 WL 90191 (S.D.N.Y. Jan. 11, 2012). In that case, the plaintiff alleged that during the fall of 2008, GE was experiencing difficulty securing funding in the commercial paper markets while making public statements such as GE "ha[d] no issues funding ourselves" in the commercial paper market and "we have met our CP funding needs every day." In re GE Sec. Litig., 2012 WL 90191, at *5-6. However, GE's CEO, Jeffrey Immelt, privately told Treasury Secretary Hank Paulson that "GE was having difficulty issuing commercial paper for terms longer than overnight." Id. at *16. In ruling upon the defendants' motion to dismiss, the Court held that even if it was true that GE was able to secure commercial paper funding at the time it made the challenged statements, GE was required to disclose the "difficulty" that it was experiencing, namely that "GE was only able to borrow money overnight" in the commercial paper markets. Id. As such, the court held that the plaintiff had adequately pled that GE's representations that it had no issues securing commercial paper funding were material misrepresentations. Plaintiff contends that the same reasoning from the In re General Electric Company Securities Litigation case applies

12

here, as Plaintiff has pled facts suggesting that while Citigroup represented to the public that it was "well in excess of the 'well-capitalized' regulatory minimums' and that it had "maintained its 'well-capitalized' position," Citigroup was privately experiencing difficulties with respect to its capital levels and was requesting government assistance.

Defendants' alleged misrepresentations in this case can be distinguished from those in the GE case. In the GE case, the court found that the plaintiffs' complaint alleged facts that were contradictory to the representations the defendants had made regarding GE's borrowing ability. The GE plaintiffs alleged that CEO Jeffrey Immelt's conversations with Secretary Paulson demonstrated GE's "difficulty funding itself," while Immelt and other GE executives simultaneously "issued several categorical denials that GE was having any difficulty whatsoever in funding itself." In re GE Sec. Litig., 2012 WL 90191, at *16. Here, the SAC does not allege facts that render Defendants' statements concerning Citigroup's capitalization levels false. The misrepresentations the SAC identifies concerning Citigroup's capitalization levels include Pandit's representations that Citigroup's "capital ratio" was "well in excess of the 'well-capitalized' regulatory minimums" (SAC ¶

13

15); Pandit's representation that "[w]e ended the quarter with a
very strong Tier 1 ratio of 8.2% and a loan loss reserve of $25
billion [and] [o]ur capital will be further strengthened by the
sale of our Germany retail banking operations in the fourth
quarter, continued focus on reducing our legacy assets, as well
as the latest steps taken by the U.S. Department of the
Treasury" (SAC ¶ 28); Citigroup's third quarter 2008 10-Q in
which Citigroup represented that it "maintained its 'well-
capitalized' position" (SAC ¶ 29); and Pandit's comments that
Citigroup's "capital is plentiful" (SAC ¶ 31).  Unlike the
misrepresentations at issue in the GE case, Defendants' alleged
misrepresentations here do not contradict the realities of
Citigroup's balance sheet.  There is no dispute that Citigroup
was, at all times, a "well-capitalized" institution as that term
is defined.

It should also be noted that Citigroup disclosed its
exposure to mortgage-related assets prior to Plaintiff's first
purchase of Citigroup stock in September 2008.  In both its 10-Q
for the first quarter of 2008 as well as its 10-Q for the second
quarter of 2008, Citigroup disclosed its exposure to tens of
billions of dollars of mortgage-related assets, including
exposures to collateralized debt obligations and residential

mortgage-backed securities backed by subprime and Alt-A
mortgages, as well as the fact that Citigroup was taking
billions in write downs on these assets.  "A misrepresentation
is immaterial if the information is already known to the market
because the misrepresentation cannot then defraud the market."
SRM Global Fund L.P. v. Countryside Fin. Corp., No. 09 Civ.
5064, 2010 WL 2473595, at *8 (S.D.N.Y. June 17, 2010) (citation
omitted).

        According to Plaintiff, the SAC demonstrates that
there is considerable overlap between Citigroup's alleged
misrepresentations concerning its capitalization levels and
Citigroup's alleged misrepresentations concerning its liquidity.
In support of this contention, Plaintiff highlights an FDIC non-
public memorandum, which states that Citigroup requested that
the government's emergency lending facilities accept collateral
"of lower credit quality or weaker underwriting standards" but
that the Federal Reserve was not "willing to accept the
collateral without a substantial haircut."  Plaintiff interprets
this memorandum as stating that as Citigroup's assets
deteriorated in value, thereby lowering its capitalization
levels, the assets Citigroup posted as collateral supported less
borrowing.  Plaintiff also contends that Citigroup's capital

15

deficiencies may have prompted the outflow of foreign deposits. Because Citigroup's liquidity misrepresentations were found to be adequately pled in the November 22 Opinion, Plaintiff contends that these linkages between Defendants' liquidity misrepresentations and capitalization misrepresentations render the SAC to have adequately pled misrepresentations regarding Citigroup's level of capitalization.

Although the November 22 Opinion held Plaintiff to have adequately pled misrepresentations concerning Citigroup's liquidity, Plaintiff cannot validate his contentions concerning Defendants' alleged misrepresentations regarding Citigroup's capitalization by focusing on the liquidity allegations. As described above, the SAC fails to plead sufficient facts establishing Defendants' to have made misrepresentations concerning Citigroup's capitalization levels.

**B. The SAC Inadequately Pleads Loss Causation**

Even if the SAC adequately pled misrepresentations concerning Citigroup's level of capitalization (the November 22 Opinion held that Plaintiff had adequately pled misrepresentations concerning liquidity, see Solow, 2011 WL

16

5869599, at *5-6), Plaintiff's Section 10(b) claim fails because the SAC inadequately pleads loss causation.  As noted in the November 22 Opinion, to state a claim under Section 10(b) and Rule 10b-5, Plaintiff must allege an injury that was proximately caused by the alleged misconduct.  See 15 U.S.C. § 78u-4(b)(4); Dura Pharm., 544 U.S. at 346-47; see also Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172-73 (2d Cir. 2005).  Loss causation "is typically shown by the reaction of the market to a 'corrective disclosure' which reveals a prior misleading statement," but "may also be shown by the 'materialization of risk' method, whereby a concealed risk - [such as] a liquidity crisis - comes to light in a series of revealing events that negatively affect stock price over time."  In re Vivendi Universal, S.A. Sec. Litig., 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011); Heller v. Goldin Restructuring Fund, L.P., 590 F. Supp. 2d 603, 623-24 (S.D.N.Y. 2008) ("Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, a plaintiff may plead that it is the materialization of the undisclosed condition or event that causes the loss.") (citation and quotation marks omitted). Conclusory allegations are insufficient to plead loss causation. See In re Merrill Lynch Tyco Research Sec. Litig., No. 03 Civ. 4080(MP), 2004 WL 305809, at *3 (S.D.N.Y. Feb. 18, 2004).

17

Plaintiff contends that he has adequately pled loss causation under a "zone of risk" theory.  Loss causation is adequately pled if "the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." E*Trade, 712 F. Supp. 2d at 202 (citation omitted).  Under the "zone of risk" test, "[i]f the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud, and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss." In re GE Sec. Litig., 2012 WL 90191, at *30 (citation omitted).

Plaintiff contends that the SAC alleges a series of events, concealed by Defendants, that revealed deficiencies in capital and liquidity and that when these events came to light, Citigroup's stock price declined.  These events, which Plaintiff alleges he relied upon in making his decision to purchase Citigroup stock, include:

- On November 17, 2008, Citigroup disclosed that it intended to move "approximately $80 billion of . . . legacy assets

18

into a held for investment, held to maturity or available for sale category[.]"  The SAC alleges that Citigroup reclassified these $80 billion in assets knowing that they would no longer be required to be marked to market and that Citigroup acted with the objective of avoiding write downs on those assets and the reduction in capital levels that write downs would entail.  Plaintiff contends that Citigroup's reclassification of assets is the type of event that a reasonable investor would have perceived as remote or highly unlikely given Citigroup's early statements regarding its "well-capitalized" status and that the announcement of the reclassification triggered a 61% decline in Citigroup's stock value.

- On November 19, 2008, Citigroup announced that it would consolidate onto its balance sheet structured investment vehicles that held $17.4 billion in assets, which had dropped in market value by $1.1 billion since September 30, 2008.  Citigroup revealed that this transaction increased Citigroup's risk-weighted assets "by approximately $2 billion," which the SAC alleges reduced Citigroup's Tier 1 capital ratio.  This announcement, which presented information contrary to Citigroup's "well-capitalized" status, prompted Citigroup's shares to fall 23% the following day.  According to the SAC, various analysts' reports support this interpretation of the November 2008 disclosures resulting in the market recognizing Citigroup's lack of capitalization, prompting a stock decline.

- On November 24, 2008, Citigroup announced a government bailout that provided $40 billion in capital benefits, including a $20 billion capital infusion and favorable capital treatment on a $306 billion portfolio of toxic assets.  The SAC alleges that this announcement revealed that Citigroup needed more capital.  Plaintiff contends that although Citigroup's stock initially rose upon news of the government's assistance, Citigroup's stock price began to decline again once the market grasped that Citigroup was forced to incur some $39 billion in losses on the $306 billion portfolio.

- On January 9, 2009, Citigroup announced a possible deal to sell its Smith Barney brokerage unit, which the SAC alleges was highlighted in one report as illustrating Citigroup's "desperate need to raise capital."  The SAC also details newspaper reports, including one with the headline "A Cash

Machine Runs Low" and a <u>New York Times</u> article that
reported that regulators were "pushing Citigroup to sell
[Smith Barney] because the company desperately needs cash."
The SAC alleges that by January 15, Citigroup's stock
dropped to $3.83, the same level it had reached before the
November 2008 bailout.

- On January 16, 2009, Citigroup announced an $8.29 billion
net loss for the fourth quarter of 2008, write downs of
$5.6 billion and outflows of foreign deposits.  According
to the SAC, Citigroup's numbers further confirmed that its
capital levels were "continuing to deteriorate as it wrote
down the value of its massive portfolio of [] toxic
assets."  An analyst on Citigroup's fourth quarter
investment call inquired as to whether Citigroup had any
capital raising plans, and another analyst's report dated
January 16 stated that Citigroup "needs to sell business
units fast, in our view, to build capital before another
big quarterly loss emerges."


        "The Second Circuit has held that 'a misstatement or

omission is the proximate cause of an investment loss if the

risk that caused the loss was within the zone of risk concealed

by the misrepresentation,' and that the loss causation inquiry

requires 'both that the loss be foreseeable and that the loss be

caused by the materialization of the concealed risk.'"  <u>Egan v.

TradingScreen, Inc.</u>, No. 10 Civ. 8202(LBS), 2011 WL 1672066, at

*13 (S.D.N.Y. May 4, 2011) (quoting <u>Lentell</u>, 396 F.3d at 173).

Notwithstanding the SAC's series of events purporting to

demonstrate the materialization of the risks Defendants'

concealed, the SAC fails to adequately link these events to the

risks Defendants allegedly concealed.

20

With respect to Citigroup's decision on November 17, 2008 to no longer mark to market the $80 billion of legacy assets, the SAC notes that Citigroup made this decision in light of the "plunging prices (and illiquidity) of asset-backed securities during the fourth quarter of 2008," not necessarily as a result of the materialization of risks Defendants' concealed.  See SAC ¶ 34.  "[I]f an intervening cause supersedes the effects of an initial misrepresentation, then a Section 10(b) claim fails."  In re QLT Inc. Sec. Litig., 312 F. Supp. 2d 526, 536 (S.D.N.Y. 2004) (citing Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 96 (2d Cir. 2001)).  In the QLT case, the court held that a pharmaceutical company's revised fourth quarter forecast was an intervening cause that superseded any direct effect of the company's alleged exaggeration of the demand for a given treatment, and, as such, plaintiffs failed to allege loss causation.  See In re QLT, 312 F. Supp. 2d at 537. In this case, the SAC itself notes that the falling value and illiquidity of asset-backed securities was an intervening cause that prompted a decline in Citigroup's stock value.

Similar reasoning can be applied to the SAC's allegations concerning Citigroup's decision to consolidate its

21

structured investment vehicle assets.  In describing Citigroup's
decision, the SAC notes that Citigroup's November 19, 2008
announcement occurred in the context of "plummeting values of
mortgage assets."  SAC ¶ 40.  As such, the SAC itself notes an
intervening cause that superseded any direct effect of
Defendants' alleged misrepresentations.  Additionally, although
Plaintiff states that the decision to consolidate these assets
negatively impacted Citigroup's capitalization, Plaintiff does
not link the decision to consolidate with any concealed risks to
Citigroup's status as a "well-capitalized" institution.

          Plaintiff highlights Citigroup's receipt of government
bailout funds and its loss of foreign deposits as representing
the materialization of concealed risks to Citigroup's
capitalization and liquidity.  However, as was noted in the
November 22 Opinion, the TARP Report Plaintiff cited in the FAC
(but deleted from the SAC) notes that "[i]n the market, the lack
of confidence in Citigroup was stressing its liquidity—there was
a run on Citigroup's foreign deposits, and counterparties had
stopped providing the institution with wholesale funding."
Solow, 2011 WL 5869599, at *10.  As such, Citigroup's liquidity
crisis can be attributed to a "lack of confidence" in the firm
rather than the materialization of a risk Defendants concealed

22

in the fall of 2008.  Plaintiff rejects this argument, instead
noting that the TARP Report, which was released in January 2011,
discussed non-public information regarding the outflows of
Citigroup's deposits, but that the public was unaware of the
loss of liquidity until the January 16, 2009 announcement.
However, Plaintiff's contention regarding the timing of when the
information became public does not address the fact that the
TARP Report found that foreign deposit outflows resulted from a
lack of confidence in the firm and not because of the
materialization of a risk Defendants misrepresented or failed to
disclose.

With respect to the January 2009 events described the
SAC, Plaintiff provides a recount of Citigroup's efforts to
shore up its balance sheet by selling the Smith Barney brokerage
business, a news report detailing the toxic assets on
Citigroup's books and Citigroup's fourth quarter earnings
announcement, which described deposit outflows and a need for
capital.  The SAC alleges that in the aftermath of these events,
Citigroup's stock price dropped.  However, the SAC does not
adequately allege that, through these events, a risk Defendants
concealed came to light thereby causing the decline in stock
value.  Rather than relate back to Defendants' alleged

23

misrepresentations, the events and dates Plaintiff identifies
relate to other negative information about the company, thereby
insufficiently establishing loss causation.  In re Williams Sec.
Litig., 558 F.3d 1130, 1140 (10th Cir. 2009) ("Any reliable
theory of loss causation that uses corrective disclosures will
have to show both that corrective information was revealed and
that this revelation caused the resulting decline in price.  To
be corrective, the disclosure need not precisely mirror the
earlier misrepresentation, but it must at least relate back to
the misrepresentation and not to some other negative information
about the company.").  Although news articles written at the
time of the Smith Barney transaction indicate that the sale was
conducted to improve Citigroup's capital position, it should be
noted that, in May 2008, months before both the financial crisis
and Plaintiff's initial purchase of stock, Citigroup announced
its intention to divest itself of assets unrelated to its global
banking business.  See "Citigroup To Shed Assets Over 3 Years,"
Los Angeles Times, May 10, 2008.  In light of the fact that the
sale of the Smith Barney brokerage business was part of
Citigroup's announced plan of divestiture, Plaintiff's efforts
to link the sale with Defendants' alleged misrepresentations in
the fall of 2008 fail.  With respect to the toxic assets
Citigroup held, the SAC alleges no link between Citigroup's

writing down of these assets and any alleged misrepresentation. The SAC's allegations regarding the fourth quarter earnings announcement closely resemble the SAC's allegations concerning Citigroup's receipt of government bailout funds and an outflow of deposits, which, for the same reasons described above, are inadequate to establish loss causation.

Irrespective of whether the SAC alleges a valid misrepresentation, Plaintiff's Section 10(b) claims fail because the SAC inadequately alleges loss causation.

**Defendants' Motion To Dismiss Counts Two And Three Is Granted**

As was the case with the FAC, Count Two of the SAC alleges a violation of Section 20(a) of the Exchange Act against Pandit, and Count Three of the SAC alleges common law fraud against both Defendants.

As was noted in the November 22 Opinion, to establish a prima facie case of control person liability, a plaintiff must show (i) a primary violation by the controlled person, (ii) control of the primary violator by the defendant, and (iii) that the controlling person was in some meaningful sense a culpable

participant in the alleged fraud perpetrated by the controlled

person.  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d

87, 108 (2d Cir. 2007); Boguslavsky v. Kaplan, 159 F.3d 715, 720

(2d Cir. 1998).  Because Plaintiff has failed to plead a primary

violation of the securities laws, his control-person claim is

also dismissed.


          With respect to the SAC's Count Three, to state a

claim for common law fraud under New York law, a plaintiff must

demonstrate "(1) a misrepresentation or omission of material

fact; (2) which the defendant knew to be false; (3) which the

defendant made with the intention of inducing reliance; (4) upon

which plaintiff reasonably relied; and (5) which caused injury

to plaintiff."  In re Optimal U.S. Litig., 813 F. Supp. 2d 351,

381 (S.D.N.Y. 2011).  "The elements of fraud under New York law

are essentially the same as those for a claim of securities

fraud under Section 10(b) and Rule 10b-5."  Serova v. Teplen,

No. 05 Civ. 6748(HB), 2006 WL 349624, at *8 (S.D.N.Y. Feb. 16,

2006) (citation and quotation marks omitted).  Common law fraud,

like securities fraud, is subject to heightened pleading

standards.  See Fed. R. Civ. P. 9(b).

26

The SAC's common law fraud claim, just like the SAC's securities fraud claim, fails to establish causation and is therefore dismissed.  See, e.g., <u>Marcus v. Frome</u>, 275 F. Supp. 2d 496, 503 (S.D.N.Y. 2003) (dismissing common law fraud claims where plaintiff failed to satisfy the pleading requirements of 10b-5 claim).

**<u>Plaintiff's Claims Are Dismissed With Prejudice</u>**

Although leave to amend should be granted freely, it is not warranted where the amendment of a complaint would be futile.  See <u>Acito v. IMCERA Grp., Inc.</u>, 47 F.3d 47, 55 (2d Cir. 1995).  Plaintiff here was permitted to amend his complaint following the November 22 Opinion, but Plaintiff has not pled a valid cause of action in his SAC.  As such, dismissal with prejudice is warranted.  See <u>San Leandro Emergency Medical Grp. Profit Sharing Plan v. Phillip Morris Co., Inc.</u>, 75 F.3d 801, 815 (2d Cir. 1996) (denying leave to replead where "the District Court had already granted plaintiffs the right to amend their complaint once"); <u>In re Ultrafem Inc. Sec. Litig.</u>, 91 F. Supp. 2d 678, 704 (S.D.N.Y. 2000) (same).  Accordingly, Plaintiff's claims are dismissed with prejudice.

27

**Conclusion**

Based on the conclusions set forth above, the SAC is dismissed with prejudice.

It is so ordered.

New York, NY
May /8, 2012

_____
ROBERT W. SWEET
U.S.D.J.

28